## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| LEANDRA GRIGSBY, | ) | |
| PLAINTIFF, | ) | |
| VS. | ) | 2:09-cv-1158-JHH |
| UNITED STATES STEEL CORPORATION, | ) | |
| | ) | |
| DEFENDANT. | | |

## MEMORANDUM OF DECISION

The court has before it the May 24, 2010 motion (doc. # 20) of Defendant United States Steel Corporation ("USS") for summary judgment.  Pursuant to the court's May 25, 2010 and June 21, 2010 orders (docs. # 24 & 28), the motion was deemed submitted, without oral argument, on June 28, 2010.  After careful consideration of the briefs and evidence submitted to the court, the court finds that USS's motion (doc. #20) is due to be granted in part and denied in part for the reasons outlined below.

### I. Procedural History

Plaintiff Leandra Grigsby commenced this action on June 9, 2009 by filing a complaint in this court alleging discrimination because of her sex and retaliation, in

violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et. seq, and in violation of the American's With Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 et seq. More specifically, Plaintiff's complaint alleged the following four counts: (1) Count I alleges that USS discriminated against her because of her gender in violation of Title VII by (a) requiring her to perform less desirable work more often than male employees, (b) denying her training during her probationary period which would allow her to step up to higher paid positions, and (c) discharging her; (2) Count II alleges that she was discharged in retaliation for her prior complaints of discrimination and because she filed an EEOC Charge of Discrimination; (3) Count III alleges that USS discriminated against her because of her disability; and (4) Count IV alleges retaliation in violation of the ADA. Defendant's motion for summary judgment asserts that Plaintiff has failed to establish a prima face case for any of Plaintiff's claims.

At the outset, the court notes that Plaintiff voluntarily withdrew Counts III and IV of the Complaint during the course of the litigation (*see* Def.'s Exh. 2, 4/5/10 letter from Daniel Arciniegas to Michael Lucas), although no amended complaint was ever filed. As such, the court does not discuss these claims or the facts surrounding these claims. Summary judgment will be entered in favor of USS as to both claims under the ADA.

Both parties have filed briefs and submitted evidence in support of their respective positions.  Defendant submitted evidence[1] (docs. # 22-23) in support of its own motion for summary judgment and filed a supporting brief (doc. #21) on May 24, 2010.  On June 15, 2010, Plaintiff filed a brief (doc. #25) and evidence[2] (doc. #26 &

---

[1] The Defendant submitted the following evidence: deposition of Plaintiff with exhibits; 4/5/10 letter from Plaintiff's Counsel to Defense Counsel; 3/9/10 letter from Plaintiff's Counsel to Defense Counsel; excerpts from Basic Labor Agreement; Plaintiff's Initial Data Entry Form; 2/22/08 Plaintiff's Receipt of Policies; USS Discriminatory Harassment Policy; Plaintiff's Training Student Transcript; Deposition of Coleman Kelly; Deposition of Charlie Lacey; Declaration of Jodi Watson and Exhibits; 04/25/08 E-mail from Kevin Henson to David Coombes re: Plaintiff; Deposition of Kevin Henson; Plaintiff's T.I.M.E.S. Payment History Report; Seniority List; Deposition of Ralph Self; Deposition of David Coombes; 05/01/08 Coombes E-mails & Henson Memo re: Plaintiff's Discharge; Deposition of Dr. Cheryl Szabo; 08/08/08 Princeton Hospital Medical Records; 08/09/08 Brookwood Urgent Care Medical Record; Deposition of Lindsey Davis; Deposition of Dr. Muhammad Ali; 08/11/08 Dr. Szabo Note to Record; 08/09/08 Notes by Coleman Kelly; 08/09/08 American Family Care Medical Record; 08/09/08 American Family Care Return to Work Form; 08/13/08 E-mail from Roy Autry to David Coombes; 08/11/08 E-mail from Coleman Kelly to Kevin Henson; 08/09/08 Princeton Medical Record by Dr. Burns; 08/09/08 Work Status Form; 08/12/08 Dr. Szabo Note to Chart; 08/13/08 American Family Care Return to Work Form; 08/13/08 Discipline Notifications; 9(b) Hearing Minutes; Second Step Minutes; 08/21/08 Supplemental Disciplinary Notifications; 08/22/08 Employee Complaint Forms; Arbitration Award; Plaintiff's EEOC Charge; Plaintiff's Supplements to EEOC Charge; EEOC Notice of Right to Sue; Declaration of Kevin Henson; Excerpts of Plaintiff's Responses to Interrogatories.

[2] The plaintiff submitted the following evidence: 2/04/08 Interview Questions; 2/14/08 Grigsby Physical Examination Report; Reynolds Statement; Seniority List;  4/25/08 Henson E-Mail; Coombes E-Mail; Coleman Termination E-Mail; Comparator Documents; William Jackson Declaration; Sandra Slater Statement; Sandra Slater Complaint; Snell Payment History; Documents from Princeton Hospital; Daniel Arciniegas' Declaration; Photograph of Gardendale Medical Center sign; Jeff Grigsby Declaration; 17 8.15.08 Accident Follow up Report; Bill from Highmark; Certificate of Physician; Coleman Notes; Disciplines; Plaintiff's EEOC Charge; Plaintiff's Second EEOC Charge; Second Step Hearing Minutes; Princeton Hospital Records; American Family Records; Work Status Form; Princeton Hospital Discharge Document.

36[3]) in opposition to Defendant's motion for summary judgment.  On June 28, 2010,

Defendant filed a brief (doc. #31) in reply to Plaintiff's opposition.  All briefs and

evidence have been considered.

## II. Standards for Evaluating a Summary Judgment Motion

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if

the pleadings, depositions, answers to interrogatories, and admissions on file, together

with the affidavits, if any, show that there is no genuine issue as to any material fact

and that the moving party is entitled to judgment as a matter of law."  *Celotex Corp.*

*v. Catrett,* 477 U.S. 317, 322 (1986); *Chapman v. AI Transp.*, 229 F.3d 1012, 1023

(11th Cir. 2000).  The party asking for summary judgment always bears the initial

responsibility of informing the court of the basis for its motion and identifying those

portions of the pleadings or filings which it believes demonstrate the absence of a

genuine issue of material fact.  *See Celotex Corp.*, 477 U.S. at 323.  After the moving

party has met its burden, Rule 56(e) requires the nonmoving party to go beyond the

pleadings and by its own affidavits, or by the depositions, answers to interrogatories,

and admissions on file, designate specific facts showing that there is a genuine issue

for trial.  *See id.* at 324.

---

[3] Pursuant to the Protective Order (doc. #15), Plaintiff filed a motion (doc. #29) to seal certain exhibits originally filed.  That motion was granted (doc. #30), and Plaintiff filed redacted versions (doc. #36) of those sealed exhibits.

The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id.* at 249.

The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial. *See Fitzpatrick*, 2 F.3d at 1115-17 (citing *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428 (11th Cir. 1991) (en banc)). If the moving party bears the burden of proof at trial, then it can only meet its initial burden on summary judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact; i.e. facts that would entitle it to a directed verdict if not controverted at trial. *See Fitzpatrick*, 2 F.3d at 1115. Once the moving party makes such a showing, the burden shifts to the non-moving party to produce significant, probative evidence demonstrating a genuine issue for trial.

5

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways.  First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the non-moving party will be unable to prove its case at trial.  Once the moving party satisfies its burden using this method, the non-moving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial.

The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to <u>affirmatively</u> show the absence of evidence in the record to support a judgment for the non-moving party on the issue in question.  This method requires more than a simple statement that the non-moving party cannot meet its burden at trial but does not require evidence negating the non-movant's claim; it simply requires the movant to point out to the district court that there is an absence of evidence to support the non-moving party's case.  <u>See</u> <u>Fitzpatrick</u>, 2 F.3d at 1115-16.  If the movant meets its initial burden by using this second method, the non-moving party may either point out to the court record evidence, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the non-moving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.  However, when responding, the non-movant can no longer

6

rest on mere allegations, but must set forth evidence of specific facts. *See Lewis v. Casey*, 518 U.S. 343, 358 (1996) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).

## III. Relevant Undisputed Facts[4]

### A. USS Structure and the USW

USS operates a steel-making facility in Fairfield, Alabama, commonly known as Fairfield Works. (*See* Compl. ¶ 4; Grigsby Dep. at 34, 40.) At all times relevant to this litigation, the Plant Manager of Fairfield Works was William Johnston. (Kelly Dep. at 7-10.) Reporting directly to Johnston was the Division Manager of Hot-Welding, Coleman Kelly. (*Id.*) He was responsible to overseeing all activities in the division, including the Cold Reduction and Pickling Department, otherwise known as the "Cold Mill." (*Id.*) Area Manager Kevin Henson was next in the chain of command, and one of his responsibilities included "lay[ing] out a schedule" regarding when employees are trained. (Self Dep. at 24-25.) Ralf Self was the Coordinator of the Cold Mill. (*Id.* at 7; Kelly Dep. at 9.) He was responsible for making production schedules, hourly schedules, and shift manager schedule, among other things. (Self

---

[4] These are the facts for summary judgment purposes only. They may not be the actual facts. *See Cox v. Administrator U.S. Steel & Carnegie*, 17 F.3d 1386, 1400 (11th Cir. 1994) ("'[W]hat we state as 'facts' in this opinion for purposes of reviewing the rulings on the summary judgment motion [ ] may not be the actual facts'") (citation omitted). Where the facts are in dispute, they are stated in the manner most favorable to the plaintiff. *See Fitzpatrick,* 2 F.3d at 1115.

Dep. at 7-8.)   Last in line were the shift managers who were responsible for overseeing the production employees; in 2008, they included Charlie Lacey, David Hovatter, Jacob Brantley and John Vincent.  (*Id.* at 11; Grigsby Dep. at 44, 53; Kelly Dep. at 11-12.)

The United Steelworkers of America ("USW") represent USS's Production and Maintenance employees.  (Def.'s Ex. 4, BLA at 7.)   Pursuant to the Basic Labor Agreement ("BLA"), which governs the terms and conditions of Fairfield Works' Bargaining Unit Employees,  new employees must serve a probationary period for the first 1,040 hours of actual work. (BLA at  75.)  Probationary employees have access to a grievance and arbitration procedure set forth in the BLA, but may be discharged as exclusively determined by USS, provided that such discharge does not violate provisions in the BLA that prohibit discrimination. (*Id.*)

### B.  Grigsby's Employment

Grigsby was hired as a Utility Person (Labor Grade 1) in the Cold Reduction Department in the Flat Roll Plant at Fairfield Works on February 22, 2008. (Compl. ¶ 4; Def.'s Ex. 5, Pl. Data Form.)  The BLA provides the following job description for Utility Person, Labor Grade 1: "Operates equipment and performs tasks such as operating labor, general labor and light mobile equipment operation required to

8

support and maintain Plant operations. Supports and assists in maintenance activities." (BLA at 185.)

When Grigsby was hired, she received a copy of USS's policies that prohibit, among other things, gender discrimination and retaliation. (Grigsby Dep. at 93-95; Def.'s Exhs. 6-8.))  These policies describe the procedures an employee must follow to complain to Management if she believes she may have been subjected to unlawful discrimination. (Def.'s Exhs. 6-8.)  The BLA also contains provisions which prohibit discrimination and retaliation against union employees. (BLA at 57-60.)  Grigsby received classroom training on these policies during her Orientation on April 9, 2008.[5] (Def.'s Exh. 9, Pl.'s Training.)

When she was first hired as a Utility Person, Grigsby was told by Coordinator Self that she would be banding steel coils, as well as doing some labor  work.[6] (Grgisby Dep. at 46- 47.)  Banding is a job function performed by Utility Persons, during which they (the "banders") fasten straps around a steel coil to secure the coil. (Grgisby Dep. at 49; Kelly Dep. at 42-44.)  Generally, two banders are scheduled to a shift. (Lacey Dep. at 13-14, 32-33.)  When an extra, or third, Utility Person is

_____

[5] The court notes that this orientation was performed two months after Grigsby was hired and began working for USS.

[6] Grigsby testified that she understood that she would be doing some general labor but it wasn't specifically described to her.  (Grigsby Dep. at 46-47.)  She stated that one day a week the male banders would have "downtime" and they would clean.  (*Id.* at 47-48.)

scheduled to work a shift, the two senior Utility Persons are assigned as banders and the third Utility Person with less seniority performs general cleaning wherever needed. (Lacey Dep. at 13-14, 32-33.) Regardless of the function being performed, all Utility Persons earn the same base salary. (BLA at 183.)

After completing basic safety training, Grigsby contends that Coordinator Self assigned her to clean the basement in the Cold Reduction department during the first two months of her probationary period.[7] (Grigsby Dep. at 44-46, 48.) Grigsby described these duties as follows:

> So, for the first two months of me working at U.S. Steel, I spent every day in the basement wearing a Tyvek Suit, cleaning grease, painting, using mineral spirits, cleaning machines, having the animal fat drip all over me and smelling really disgusting. And in the heat, it is very, very hot in that basement. I spent every single day for two solid months my first two months of employment in that basement. And when I would come up from the basement covered in animal fat smelling and being hot and feeling like I was going to pass out, I would come up, I would have to take off that Tyvek suit and all the men[8] on the

_____

[7] Grigsby testified that she, unlike all other male Utility Persons, reported directly to Coordinator Ralph Self for her daily job assignments. (Grigsby Dep. at 40-41, 45, 51.) Male employees, by contrast, learned their assignments from a Crew Line-Up Sheet posted each day, for each shift, by Shift Managers. (*Id.* at 51; Self Dep. at 35.) Grigsby worked the day shift, 6:30 a.m. to 2:30 p.m., and did not rotate shifts at the beginning of her employment. (Grigsby Dep. at 49-50.) Although Shift Managers rotated through the day shift, Coordinator Self was always present during Grigsby's shift. (*Id.* at 52-53.)

[8] Grigsby could not specifically recall who made these comments and she only complained once about them to Henson in late April 2008, before consideration of the

> floor would be staring at me saying, ha-ha, look at her, she
> likes it dirty, she's a dirty girl. Just all kinds of comments
> like that.
>
> I spent every day for two solid months in that basement
> doing that by myself away from all the people you know,
> not interacting, wondering what I just signed up for.

(*Id.* at 45-46.)  Although Grigsby admitted that cleaning fell within her regular job responsibilities, she testified that male Utility Persons were assigned cleaning duties only once a week, on "downturn," when production stopped.  (*Id.* at 47-48, 66.) Grigsby contends, however, that she was required to clean the basement as her primary duty, every day, including shoveling sludge, unlike the men in her same position.  (*Id.*)  Grigsby testified that she complained to Self about having to clean the basement.  (*Id.* at 61, 64, 75.)

USS maintains that during Grigsby's first month of employment, there were no less senior Utility Persons in the Cold Reduction Department and thereafter there was only one less senior Utility Person, Sandra Slater, in the Cold Reduction Department until the middle of June 2008.  (Watson Decl. ¶ 5; Exh. 2 to Watson Decl.)  Further, Grigsby admitted that later in her employment, four male employees who were hired after her, and therefore had less seniority than her cleaned the mill while she was

---

termination of her probationary employment.  (Grigsby Dep. at 57-58.)

doing "banding."  (Grigsby Dep. at 146-48.)  They did not, however, spend months cleaning the basement alone.  (*Id.*)

### C.  Alleged Sexual Overtures from Self and Other Employees

Grigsby testified that between February and April, 2008, while she worked in the basement alone, Coordinator Self asked Grigsby to go out with him numerous times. (*Id.* at 109.) When Grigsby declined, Grigsby maintains that Self changed her assignment from painting in the basement to shoveling sludge in the basement. (*Id.*) According to Grigsby, Self warned her daily that he made the call as to whether or not she made it off probation. (*Id.* at 110.)  Grigsby stated that she ultimately agreed to go out with Coordinator Self, and shortly thereafter, in April 2008, she was permitted to begin training on banding.  (*Id.* at 58, 112-13.) Further, Grigsby testified that when she complained to Self about having to clean the basement, he told her "I'll take care of you if you take care of me."[9]  (*Id.* at 64, 107.)

On one occasion, a union employee named Russell Snell referred to Grigsby and another female employee, Sandra Slater, as "Ralph's ho's."  (Grigsby Dep. at 102-05.)  Grigsby did not hear the comment first-hand, however, and only learned of

---

[9] Grigsby testified that she began going out with Self in the summer of 2008 and that she had a sexual relationship with him.  (Grigsby Dep. at 113-16.)  Self denies having a sexual relationship with Grigsby, although he did admit that he was friends with Grigsby and that he helped her pay utility bills and bought presents for her children.  (Self Dep. at 16, 22-23, 73.)  Grigsby never reported the alleged sexual relationship to USS until her deposition on February 24, 2010.  (Grigsby Dep. at 121.)

the comment from Slater, who reported it to management.  (*Id.* at 103-04.)   Henson and Self met with Snell and counseled him about this inappropriate behavior.  (Self Dep. at 72.)  Snell was reprimanded and warned that a repeat offense would result in more severe discipline.  (Watson Decl. ¶ 8; Exh. 5 to Watson Decl.)

Grigsby also testified that another employee, David Hovator, made a comment to her that she interpreted as a reference to her relationship with Self.  (Grigsby Dep. at 130-32.)  In response to Grigsby trying to avoid working a double shift, Grigsby said to Hovator "come on David, what have I ever done to you?"  (*Id.*)  Grigsby testified that Hovator responded  "It's not what you've done, maybe it's what you haven't done."  (*Id.*)  USS never received a complaint about this comment from Grgisby.  (Watson Decl. ¶ 9.)

In addition, Grigsby testified that at the time she was cleaning the basement, she spoke to Self about needing new protective clothing because hers were "essentially ruined from being in the basement in the sludge." (Grigsby Dep. at 119.) Self responded that he would get her a new pair, and then "he stood back like this in from of Charlie Lacey and he looked at me, what do you need, about a size . . . . He said well, you need to get them about two sizes too small, because I like to see you like that." (*Id.* at 119-20.)

### D.  April 2008

In approximately April 2008, after the first two months of exclusively cleaning the basement, Grigsby testified that she moved upstairs to cleaning the manager's offices and other areas of the department.  (*Id.* at 75-76.)   She described her work as essentially a "janitorial position for the managers."  (*Id.* at 60.)  She stated that she cleaned the manager offices and was "put on display" as the offices had windows on three sides so everyone could see what she was doing. (*Id.*) Grigsby stated that she "had to stand on the desk and clean the windows with all the men on the floor pointing at me and laughing at me.  I was made to climb on my hands and knees on the floor and clean." (*Id.*)  She described additional duties such as cleaning out the trash can where the managers spit their tobacco dip. (*Id.* at 72.)  One particular day, Grigsby testified that Self

> . . . made [her] climb down on my hands and knees and pick up paper from under his desk while he sat in his chair, I had to crawl under his desk. And I remember specifically telling him, because this is a room with three sides windows where all the men are on the outside. I asked him - - I said do you know what that's going to look like, me on my hand and knees crawling under your desk while you're sitting in your chair, and he said you're on probation you do what I tell you to do. . . .

14

(*Id.* at 75-76.)   Grigsby also testified that Self took Grigsby and another female employee, Sandra Slater, to a conference room where he said "that's a big table, that's big enough for both of you guys to lay out on." (*Id.* at 101.)

In addition to cleaning the manager's offices, Grigsby also began banding in the middle of April 2008, while she was still on probation. (*See* Grigsby Dep. at 58, 85; Def.'s Exh. 13.)   In her first few weeks of banding, she had an incident with another bander.   On April 25, 2008, Shift Manager Charlie Lacey reported to Area Manager Kevin Henson that Grigsby was crying and upset.   (Lacey Dep. at 37-38; Def.'s Exh. 13; Henson Dep. at 33.)   Lacey told Henson that Grigsby was banding heavy gauge coils with Reginald Lee, and Lee was complaining that Grigsby was too slow and causing the banders to fall behind.   (Def.'s Exh. 13.)   Henson went to the mill and interviewing Grigsby who stated that Lee "was giving her a hard time about being slow" and "accusing her of taking her time on purpose." (*Id.*)   According to Henson, Grigsby further stated that "we did not want her at the mill anyway and we were setting her up for failure." (*Id.*)

Grigsby testified that she complained to Henson as follows:

> I felt like I was being treated differently and unequally.  I was not given the training that the other male employees were given.  I was being put on display.  I was having to be treated as if I wasn't good as anyone else.  I was having to put up with comments from both management and from

15

> union.   I complained about everything.   I told them
> specifically word for word, I said I don't believe you want
> women out here, I said those words.

(Grigsby Dep. at 77.)  She further stated that Henson responded by yelling at her that

those were serious accusation and that she needed to remember that she was still on

probation.  (*Id.* at 77-78.)

   According to Henson, he told Grigsby that USS prohibited any form of

harassment and that he would interview Lee about the event.  (*Id.*)  He also told

Grigsby that the claims she made about USS not wanting her at the mill were false,

although it was her responsibility to learn the job and perform it safely.  (*Id.*)  Henson

further stated that if she had trouble keeping up she should advise her supervisor, but

that he would arrange for her to receive more training on banding until she felt more

comfortable.  (*Id.*)  He reminded her that she was only in her second week of banding

and it was the first time on heavy gauge, and thanked her for reporting the incident.

(*Id.*)

   Henson spoke with Lee who denied making fun of Grigsby.  (*Id.*)  Henson

reminded Lee of USS harassment policy and told him that any type of harassment

would not be tolerated.  (*Id.*) He also reminded Lee that he was slow when he first

began and that the other banders worked with him to make him more efficient.

Henson asked that the same courtesy be extended to Grigsby.  (*Id.*)

### E.  Alleged Denial of Training

As Area Manager, Henson decided which positions received training and where the focus should be at any given time.  (Henson Dep. at 17-18; Henson Decl. ¶ 4.)  Henson normally trained employees on overtime shifts and had budgetary constraints that limited the amount of overtime available for training.  (Henson Decl. ¶ 5.)  Henson determined which position had the greatest need for training, the amount of overtime budgeted for training, and then focused training on certain positions.  (*Id.* ¶ 6.)  As a result, individual employees did not automatically receive training in certain positions merely because they had been working in his area for a certain period of time.  (*Id.* ¶ 11.)  Instead, employees received training when business needs necessitated such training and the budget allowed for overtime training.  (*Id.*)

When Henson determined that training could be conducted, he would instruct Coordinator Self where to focus the training.  (Henson Dep. at 17-18, 138.)  The individuals were selected for training for a particular position based on departmental seniority.  (*Id.* at 18; Henson Decl. ¶ 9.)  In certain situations, employees could waive training on a particular position or not be qualified for training due to a physical limitation. (Henson Decl. ¶ 10.)

During the pertinent time period, the seniority list for Utility Persons in Cold Reduction were as follows, from highest to lowest:

> Russell Snell
> Maurice Williams
> Kevin Aguiar
> Steven Truett
> Reginald Lee
> Leandra Grigsby
> Sandra Slater
> Earnest Mullins
> William Chambers
> Kirk Ratcliff
> Christopher Barker

(Grigsby Dep. at 85; Def.'s Exh. 16.)  During Grigsby's first month of employment, there was no less senior Utility Person in the Cold Reduction Department.  (Watson Decl. ¶¶ 4-5; Exhs. 1-2 to Watson Decl.; Def.'s Exh. 16.)  Thereafter, the only less senior Utility Person in the Cold Reduction Department was Sandra Slater until mid-June 2008, approximately four months after Grigsby was hired.  (*Id.*)

Grigsby contends, however, that she was denied training opportunities afforded to male employees.  (Pl. Br. at 14-18.)  She testified that while on probation, she frequently asked Henson, Self and Lacey to allow her training opportunities, even on her own time, and her requests were denied.  (Grigsby Dep. at 43, 166-67.)  She contends that they told her that she could not begin training on equipment like a forklift or even a pick-up truck without first going through New Employee

18

Orientation, which she did not complete until two months into her probationary period. (*Id.* at 42-43.)

By contrast, Grigsby contends that male employees were provided New Employee Orientation soon after they began work. For example, Chris Barker, William Chambers, Kirk Ratcliff and Earnest Mullins all began work on June 16, 2008 and attended New Employee Training the very next day. (Pl. Exh. 8.) Additionally, Demetrius Reynolds, a male Utility Person, testified that he was assigned to perform banding work without having to complete New Employee Orientation. (Reynolds Decl. ¶ 3.)

Further, Grigsby testified that even after she was allowed to attend New Employee Orientation in April 2008, USS continued to deny her training and the consequential "step-up pay" she could have received for training in different areas.[10] (Grigsby Dep. at 168-69.) Grigsby contends that she was refused any training on positions in a higher-graded job class. (*Id.*; Pl. Br. at 16.) She testified that around the time she completed her probation, she asked Shift Manager Lacey when she could train. (Grigsby Dep. at 139.) Grigsby stated that Lacey responses by stating "you

---

[10] USS employees receive "step-up pay" when filing positions in a higher job class. (Lacey Dep. at 14-15.) Although many positions were permanently filled according to seniority, employees trained for and conducted work in higher paying job codes on a temporary basis when the need arose. (*See id.*) When employees worked in a higher job code, even if only for a couple of hours, they were paid the increased "step up rate" for the time they performed that higher-coded work. (*See id.*)

used to bring us biscuits when you were on probation, now you don't do anything like that anymore; if you bring biscuits, I'll let you train." (*Id.*)

In addition, Grigsby contends that less senior male employees received advanced training on equipment sooner than Grigsby. She testified that Ralph Truett bragged to her about receiving training on the Ram Tractor[11] during his probationary period. (*Id.* at 58.) It is undisputed, however, that Truett is a more senior employee and his probation period ended within a week of Grigsby's hire. (Id. at 58, 68; Watson Decl. ¶ 7.) Grigsby also points to Utility Persons Chris Barker and William Chambers who were hired after her in June 2008, and contends that they were training on the Ram Tractor within two months. (Jackson Decl. ¶¶ 5-6.) Additionally, Barker was permitted to drive the forklift while Grigsby was forced to walk beside it and pick up trash. (*Id.* ¶ 8.)

Grigsby admits that she received training as a bander before her probationary period ended, and the evidence establishes that she was banding coils as early as mid-April, during the second month of her probationary period. (Grigsby Dep. at 58, 82.)

---

[11] The Ram Tractor is a large-scale forklift that transports steel coils to storage or inspection areas. (Coombes Dep. at 53.) Ram Tractor operators are Labor Grade 2 positions which receive higher pay under the BLA. (*Id.* at 53-54.) Carol Farless, a female employee, was permanently assigned to operate the Ram Tractor. (Grigsby Dep. at 83-84.)

Grigsby also received training on the forklift and was certified to operate it before her probationary period ended.  (Id. at 82.)

## F.  Consideration of Probationary Discharge

On May 1, 2008, Grigsby's husband called and informed Coordinator Self that Grgisby would not be at work that day because she had been arrested for domestic violence towards her daughter[12] and was in jail.  (Grigsby Dep. at 19-21, 98; Self Dep. 43-44.)  Self reported this information to Area Manager Henson.  (Self Dep. at 54-59.)

Apparently there was some discussion about terminating Grigsby during her probationary period around the time of the above absence from work.  The evidence is unclear as to why the discussions began,[13] but, nevertheless, it is undisputed that USS considered terminating Grigsby during her probationary period.  On May 1, 2008, Division Manager Coleman Kelly inquired of Coombes and Henson about how many hours remained on Grigsby's probationary period.  (Pl. Exh. 7.)  He stated that

---

[12] Apparently, Grigsby's daughter suffers from an emotional disorder and that morning she had tried to harm herself.  (Grigsby Dep. at 19.)  According in Grigsby, she and her daughter "got into a scuffle" while Grigsby was attempting to prevent her daughter from harming herself, but when the police arrived they only noted that her daughter was bleeding and therefore arrested Grigsby.  (Id. at 19-20.)  She was released and not subject to any criminal charges.  (Id. at 20.)  Her daughter subsequently entered treatment and the family entered family counseling. (Id.)

[13] There is some testimony regarding "an absence" or "attendance issues" that spurred the initiation of the termination discussions.  (Coombes Dep. at 58, 62.)  Henson could not recall why he initially sought her termination.  (Henson Dep. at 58.)

he was "under some pressure to retain" Grigsby.[14]  (*Id.*)  Coombes responded that she only had 2 months time.  (*Id.*)  Later that day, David Coombes sent Henson an e-mail with the subject line "Leandra Grigsby" and attached a notice to Grigsby that her probationary employment was terminated.  (Pl. Exh. 6.)  Grigsby was never given this notice, however, and the termination never occurred.  (Coombes Dep. at 58-63; Kelly Dep. at 106-09.)   Grigsby completed her probationary period on July 15, 2008. (Watson Decl. ¶ 7.)

### G.  August 8, 2008 Injury and Aftermath

On Friday, August 8, 2008, Grigsby suffered a cut on the left side of her neck from one of the metal bands she was using to hold coils.  (Grigsby Dep. at 182-84.) She reported her injury to the shift manager on duty and was transferred to the Emergency Room at Princeton Hospital[15] for treatment because the medical department at Fairfield Woks had closed for the day.  (*Id.* at 184-85; Kelly Dep. at 46.)  Dr. Phan treated Grigsby at Princeton Hospital; he described the cut on her neck as superficial, placed steri-strips over the laceration, and gave her a tetanus shot.

---

[14] Grigsby's husband was a supervisor at Fairfield Works at that time and, according to Kelly, was a good employee and was asked to try to keep Grigsby because of her husband. (Kelly Dep. at 109-10.)  Grigsby's husband now works at USS headquarters in Pittsburgh, Pennsylvania.  (Grigsby Dep. at 10, 21, 192.)

[15] Princeton Hospital is the designated workers' compensation provider for treating USS employees who sustain work-related injuries.  (Coombes Dep. at 68-69; Szabo Dep. at 36.)

(Grigsby Dep. at 185, 188; Def.'s Exh. 21.)  She was not given any antibiotics.  (*Id.*)

Dr. Phan released her to return to work without restrictions.  (*Id.*)   Grigsby returned

to work that night, submitted the paperwork given to her by Dr. Phan to the shift

manager, and completed her shift.  (Grigsby Dep. at 188, 190.)

The next day, Saturday August 9, 2008, Grigsby was scheduled to work for the

3:00 pm to 11:00 pm shift.  (*Id.* at 190.)  Grigsby testified that she woke up feeling

ill and had an elevated temperature.  (*Id.* at 191.) She asked her husband to drive her

to the doctor and he took her to the closest place, a facility Grigsby refers to as the

Gardendale Medical Center.  (*Id.* at 193.)  The clinic visited by Grigsby is located at

the Gardendale Medical Center, but is actually a Brookwood Urgent Care Center, a

satellite facility to the larger Brookwood Primary Care Network.[16]   (*Id.* at 199;

Coombes Dep. at 104-05; Ali Dep. at 46-48.)

Upon entering the clinic, Grigsby testified that she told Medical Assistant

Lindsey Davis and Doctor Muhamed Ali that she was feeling sick and achy, did not

have any energy and was running a temperature.  (Grigsby Dep. at 195-96.)  The

Medical Assistant recorded Grigsby's "chief complaint" and "present illness" as

follows:

---

[16] Grigsby testified that at the time she visited the Gardendale facility, she did not know it was operated by Brookwood.  (*See* Grigsby Dep. at 258.)

> Cut on left side of neck.  Went to doctor at work on site.
> They super glued the cut and gave a tetanus shot.  It
> happened last night.  They treated it by supergluing the cut
> and gave tetanus shot.
>
> Patient just wants another doctor's opinion about being on
> antibiotics.  Patient states the cut bled a lot and she has a
> history of anemia.  Patient states she feels "crappy" and
> wants to make sure that everything is ok.

(Def.'s Exh. 22.)

Contrary to the notes recorded by the Medical Assistant, Grigsby testified that although Dr. Ali asked her about the bandage on her neck and she told him that she cut herself at work the previous day, she never said that she wanted a second opinion on her neck and did not complain about her neck at all.  (Grigsby Dep. at 196-99; Grigsby Decl. ¶ 2.)   Instead, Grigsby testified that she discussed her neck only in response to inquiries about her bandage and recent medical history.  (*Id.*)   She contends that her chief complaint was that she was feeling sick, did not have any energy and was running a fever.  (Grigsby Dep. at 195-96.)  Grigsby's husband confirms his wife's testimony regarding what was said.  (Grigsby Decl. ¶ 2.)

As Dr. Ali was about to prescribe medicine for Grigsby, he asked her what medications she had received the night before for the cut on her neck.  (Grigsby Dep. at 200.)  Grigsby told him that she had received a tetanus shot, but was not sure if she had been given anything else.  (*Id.* at 200-01.)  Dr. Ali responded that he needed to

24

verify what medication(s) she had been given before he could prescribe her any additional medicine, and asked if he could contact the Plant Medical Director at USS, Dr. Cheryl Szabo, to verify that she had only received a tetanus shot.[17]  (*Id.* at 202-03; Ali Dep. at 39.)   Grigsby agreed and gave Dr. Ali permission to discuss the medication with Dr. Szabo; she gave Dr. Ali the phone number for the gate at Fairfield Works as that was the only number she knew.  (Grigsby Dep. at 202-03.) Dr. Ali stepped out of the room, called the gate at Fairfield Works, and Dr. Szabo called him back shortly thereafter.  (*Id.* at 204; Szabo Dep. at 108.)

Grigsby testified that she heard Dr. Ali's part of the conversation, as he was standing at the nurse's station right outside her door.  (Grigsby Dep. at 203-04.)  She stated that Dr. Ali told Dr. Szabo that he was calling to verify what medication Grigsby was taking before writing her a  prescription.  (*Id.* at 204-05.)  She then stated that there was long pause on the part of Dr. Ali, and then "the whole tone of his conversation changed" - that he "was all of a sudden yes ma'am, yes ma'am."  (*Id.* at 205.)

---

[17] Dr. Ali's testified that he called Fairfield Works to learn about her work restrictions. (Ali Dep. at 39-40.)

Dr. Szabo, however, told a different story regarding the conversation with Dr. Ali.[18]  She testified that she was told that a doctor had called from Brookwood, and she returned his call.  (Szabo Dep. at 36, 109; Def.'s Exh. 25.)  She stated that the doctor told her that Grigsby was there and wanted to see him for a second opinion for her neck injury.  (*Id.*)  Dr. Szabo testified that she told Dr. Ali that he was not a designated treating physician for work-related injuries and that Grigsby would have to go to Princeton Hospital for follow-up treatment because Princeton was USS's designated treating facility.  (Szabo Dep. at 36, 110; Ali Dep. at 18; Def.'s Exh. 25.)

After the conclusion of the phone call, Dr. Ali came back into the examination room and informed Grigsby that he could not treat her, that Dr. Szabo did not want him to treat her.  (*Id.*)  Grigsby asked what she was supposed to do, and Dr. Ali told her that she could go to the Fairfield Works Medical Center or to Princeton to be treated.  (*Id.* at 205-06.)  Grigsby explained that the Fairfield Medical was closed on Saturdays, she did not know what was wrong with her, and she did not want to go and sit for three hours in the waiting room of Princeton ER for what could just be a fever.  (*Id.* at 206.)  Dr. Ali said that he could not help her and left the room.  (*Id.*)

---

[18] Dr. Szabo could not recall the name of the doctor with whom she spoke, but it is undisputed that she spoke with Dr. Ali.

Because she could not get treated by Dr. Ali, Grigsby went to a nearby American Family Care (AFC) medical center, on the suggestion of the receptionist as she was leaving the Gardendale facility.[19] (*Id.* at 207-09.)  She did not go to Princeton as directed by Dr. Szabo.  While in the waiting room at AFC, Grigsby called the Fairfield Works' report-off number; no one answered and she the following voicemail, in part:

> Hey, this is Grigsby.  I am in the doctor's office right now. I woke up this morning running a fever and my neck is really stiff and inflamed around the cut.  Pretty soon they're going to tell me it's infected.  Like I said, I am in the doctor's office right this minute. . . .   I took my temperature and it was almost a hundred and mine usually runs low.  So, for me that's about three degrees too high. . . . I'm going ahead and calling off for tonight.  I will bring a doctor's excuse.

(*Id.* at 212, 214-16, 225-27.)

Grigsby was examined by Dr. John Holloway at AFC.  Similar to her chart at the Gardendale facility, her chart read "Patient says that she got cut by a piece of metal.  Patient says that she thinks that it is infected."  (*Id.* at 218; Def.'s Exh. 27.) According to Grigsby, however, she told him that she had a fever and was generally

---

[19] Grigsby testified that she was told that she did not have to pay a co-pay because Dr. Ali had not treated her (Grigsby Dep. at 207-08), but that Brookwood Urgent Care did later attempt to charge Grigsby's private insurance for the outpatient visit and did not charge USS.  (Pl.'s Exh. 18.)

feeling "really bad." (*Id.* at 213.)  Grigsby denies saying anything related to her neck being infected, and that she only spoke to Dr. Holloway about her neck injury when he inquired about her bandage.  (*Id.* at 214, 219.)  Dr. Holloway took a blood sample and after receiving the results, gave Grigsby two prescriptions and a note excusing her from work until August 11, 2008.  (*Id.* at 220; Def.'s Exh. 28.)

Meanwhile, at Fairfield Works, after speaking with Dr. Ali, Dr. Szabo then called USS Division Manager Coleman Kelly, told him about her conversation with Dr. Ali, and put Kelly on notice that Grigsby was likely to call in sick for the day. (Szabo Dep. at 110; Kelly Dep. at 55-58; Def.'s Exh. 26.)  Shift Manager Lacey received Grigsby's voicemail reporting off from work and called Kelly to tell him. (Kelly Dep. at 58-59; Lacey Dep. at 62, 68.)  Kelly told Lacey to contact Grigsby and tell her to report for work since USS's records indicated that she was released for regular work.  (Kelly Dep. at 60.)  Lacey then called Grigsby, while she was still at AFC, and instructed her to report to work or face discipline.  (Grigsby Dep. at 230-31.)  Grigsby told Lacey that she had a blood infection, anemia and a doctor's note excusing her from work until August 11.  (*Id.*)  When Lacey reiterated that Grigsby needed to return to work, Grigsby asked to speak with her union grievance representative, William Jackson.  (*Id.* at 231.)  Lacey and Jackson called Grigsby back shortly thereafter and, according to Grigsby, Jackson disagreed with Lacey

requiring her to come to work since she had a doctor's excuse for a non-work related illness.  (*Id.* at 231-33.)  The phone call ended with Lacey again telling her to come into work, and Jackson saying that although he did not agree with the decision, they would work it out once she got there.  (*Id.* at 233.)  Grigsby reported into work as instructed.  (*Id.* at 234.)

When Girgsby arrived at Fairfield Works, she reported to Lacey's office and gave Lacey the excuse from Dr. Holloway.  (*Id.* at 234; Lacey Dep. at 74.)  William Jackson met her at Lacey's office, and Coy Autry was also present.  (Grigsby Dep. at 235-37.)  Someone asked Grigsby how she was feeling and, according to Grigsby, she stated that she had  gone to the doctor, was anemic and tendered her doctor's excuse along with copied of her prescriptions and blood work report. (*Id.* at 237-38.) Lacey, however, testified that Grigsby replied that "she didn't feel well because her neck was infected and that was the reason she sought a second, unbiased opinion." (Lacey Dep. at 65, 86; Def.'s Exh. 29.)  Grigsby denies that she made any statement about her neck.  (Grigsby Dep. at 237.)

Regardless of what was said, Lacey insisted that Grigsby go to work.  (*Id.* at 238.)  Jackson asked her if she felt well enough to work and Grigsby replied "no." (*Id.*)  Lacey and Jackson continued to go back and forth about whether it was appropriate to require Grigsby to work, and Lacey stated that he was only doing what

29

his boss, Kelly, told him to do.  (*Id.* at 238, 234.)  Jackson then called Kelly, and

Lacey told him that Grigsby said that she was weak and could not perform her job.

(Kelly Dep. at 61; Def.'s Exh. 26.)  Kelly contacted Dr. Szabo and then told Lacey

to have Grigsby taken to Princeton Hospital for another examination.  (Grigsby Dep.

at 244; Kelly Dep. at 62-63.)

USS Security Lieutenant Don Perry, transported Grigsby to Princeton Hospital

in USS's ambulance.  (Grigsby Dep. at 244-25.)  While on the way to Princeton,

Perry asked Grigsby why she went to Brookwood Hospital.  (*Id.*)  She responded that

she had not gone there.  (*Id.*)  According to Grigsby, she did not know at that time

that the Gardendale medical facility she visited was operated by Brookwood Urgent

Care.  *(Id.* at 258.)

At Princeton Grigsby was seen by Dr. Phan, the same doctor who treated her

for the neck abrasion the night before. (*Id.* at 245.)  The notes from the nurse indicate

that Grigsby's chief complaint was that she felt "feverish, achy." (Szabo Dep. at 87.)

According to Grigsby, Dr. Phan first asked her who gave her permission to go to

Brookwood Hospital.  (Grigsby Dep. at 245-46.)  Dr. Phan then examined Grigsby's

wound, performed some blood work, said that nothing was wrong, and released her

for work.  (*Id.*; Szabo Deo. at 86.)   Dr. Szabo learned of her release and informed

Kelly that Grigsby had been cleared for work by Dr. Phan; Kelly then forwarded this information to Lacey. (Kelly Dep. at 54-65; Def.'s Exh. 26.)

Grigsby returned to Fairfield Works and reported to Lacey's office. (Grigsby Dep. at 246.) According to Grigsby, Lacey and Jackson were still arguing about her going back to work. (*Id.* at 246-47.) Jackson asked Lacey why the examination from Princeton Hospital trumped the private doctor's excuse Grigsby submitted, and Lacey responded that he was only doing what his boss told him to do. (*Id.* at 247.) Lacey asked Grigsby if she was refusing to work, and she said no. (*Id.*) Jackson then asked her if she felt well enough to work, and again she said no, she was not feeling well enough to band coils. (*Id.* at 247-48.) Jackson finally asked to speak to Kelly about the situation. (*Id.* at 247; Kelly Dep. at 66; Def.'s Exh. 26.)

Lacey called Kelly and gave the phone to Jackson. (Grigsby Dep. at 247.) Jackson told Kelly that Grigsby had a medical excuse, that she was ill, and that her illness was not work related. (Kelly Dep. at 66; Def.'s Exh. 26.) Kelly testified that he told Jackson that Grigsby had been released to work by Princeton and that he had reason to believe that she had gone to Brookwood for treatment for a work-related injury. (Kelly Dep. at 71; Def's Exh. 26.) Grigsby denied that she had been at Brookwood and Jackson told Kelly that Grigsby had an excuse from AFC. (Grigsby Dep. at 247-48; Kelly Dep. at 84-85; Def.'s Exhs. 26 & 30.) Jackson wanted

31

assurance from Kelly that Grigsby would not be disciplined, but Kelly would not give such assurance.[20]  (Kelly Dep. at 72-73; Def.'s Exh. 26.)  Kelly then instructed Lacey to tell Grigsby to return to work or "face the consequences."  (Kelly Dep. at 85; Def.'s Exh. 26.)  Kelly testified that he was operating on Grigsby's report that she was at the doctor seeking treatment for a work-related injury.  (Kelly Dep. at 74, 76.)

When the telephone conversation concluded, Lacey instructed Grigsby to wait in the break room.  (Grigsby Dep. at 249-50.)  While in the break room, Grigsby contends that she became ill and vomited.  (*Id.*)  She immediately called Lacey, and he came to the break room to verify her account.  (*Id.* at 250.)  Grigsby then went back to Lacey's office; Lacey, Jackson, Lieutenant Perry and another security guard were in Lacey's office.  (*Id.* at 251.)  According to Grigsby, Lieutenant Perry yelled at her, told her that he was "tired of this shit and pointing his finger in [her] face and told [her] to quit playing games and . . . get out there and go to work."  (*Id.*)  Perry stated that he had already taken her to Princeton, there was nothing wrong with her, and she needed to get back to work.  (*Id.*)

---

[20] According to Jackson, Kelly asked Jackson why he was helping Grigsby, stating "you know she is sucking and fucking everyone in the plant" and "you know she is snitching on black people."  (Jackson Decl. ¶ 9.)  Jackson also testified that Kelly stated "we should have fired her ass while she was on probation."  (*Id.* ¶ 11.)

Jackson replied that Grigsby had just vomited, had a doctor's excuse, and did not believe that Perry was instructing her to go back to work.  (Id. at 252-53.)  Perry called Dr. Szabo and stated that Grigsby claimed she was sick, nauseated and had vomited in the break room.  (*Id.* at 253; Szabo Dep. at 93-94; Def.'s Exh. 25.)  Perry, however, told Szabo that he looked at the alleged vomit and it was really just spit, not vomit.  (Szabo Dep. at 93-94; Def.'s Exh. 25.)  Dr. Szabo directed that Grigsby be taken back to Princeton.  (*Id.*; Grgisby Dep. at 253.)

On her second trip to Princeton that day, Grigsby was seen by Dr. Burns. (Grigsby Dep. at 254.)  Grigsby explained to Dr. Burns what Dr. Holloway from AFC told her and gave Dr. Burns the prescriptions Dr. Holloway had written.  (*Id.*)  Dr. Burns left the room, returned with the blood work performed by Dr. Phan and concluded that she had a "viral syndrome."  (*Id.*; Def.'s Exh. 31.)  Dr. Burns completed a work excuse, stating that she was to return to work as prescribed by her personal physician.  (*Id.*; Def.'s Exh. 32.)  Grigsby was taken back to the plant and then went home.  (Grigsby Dep. at 254-55; Def.'s Exh. 32.)

33

### H.  Grigsby's Return to Work on August 12, 2008

Grigsby returned to work on Agusut 12, 2008[21] and reported to the medical department with her return-to-work release from Dr. Holloway of AFC.  (Grigsby Dep. at 255-56; Szabo Dep. at 59, 61.)  Dr. Szabo examined Grigsby, removed the bandage on her neck, said she looked fine and released Grigsby to return to work. (Grigsby Dep. at 258-59; Szabo Dep. at 60; Def.'s Exh. 33.)  According to Dr. Szabo, Szabo asked Grigsby if she had been to Brookwood Urgent Care, and Grigsby denied going there.  (Szabo Dep. at 60.)  Grigsby denies that Dr. Szabo asked her this question.  (Grigsby Dep. at 259.)  After Grigsby left the medical department, Dr. Szabo confirmed with the Security Department that the call she received on August 9, 2008 was from Brookwood.  (Szabo Dep. at 133-34; Def.'s Exh. 33.)

After being released by Dr. Szabo, Grigsby returned to work, but she was not on the crew line schedule.  (Grigsby Dep. at 259-61.)  Grigsby spoke with Lacey who told her he had called Security to come and get her because Dr. Szabo wanted her to return to the medical building.  (*Id.* at 260-61.)  When Grigsby arrived back at the medical building, Dr. Szabo asked her whether she had been seen at Brookwood,

---

[21] Although her medical excuse allowed her to return to work on August 11, 2008, Grigsby was not scheduled to work that day.  (Grigsby Dep. at 256-57.)

Brookwood Hospital, Brookwood ER or Brookwood Urgent Care.[22]  (*Id.* at 261-62;

Szabo Dep. at 133-34; Coombes Dep. at 176-78.)  Grigsby responded that she had

not.  (*Id.*)  In addition to questioning Grigsby, Dr. Szabo asked Grigsby to sign two

medical release forms.  (Grigsby Dep. at 261-62.)  Grigsby contends that the forms

were blank and she was not given an explanation regarding them.[23]  (*Id.*)  Therefore,

Grigsby refused to sign the medical release forms.  (*Id.*)

Because Grigsby refused to sign the medical release forms, Dr. Szabo placed

Grigsby on "Medical Class III" which barred Grigsby from the plant.  (*Id.* at 262-63;

Szabo Dep. at 136-37.)  According to Grigsby, Dr. Szabo told her "I'm not going to

argue with you, sign this or you're out."  (Grigsby Dep. at 266.)  When she did not

sign them, Dr. Szabo had security escort her out of Fairfield Works.  (*Id.* at 267.)

The following day, August 13, 2008, Grigsby returned to AFC to see Dr.

Holloway and received another return-to-work slip which stated that she could return

to work on August 14, 2008.  (*Id.* at 279; Def.'s Exh. 34.)  Dr. Holloway specifically

noted on the form that Grigsby had a "non worker comp illness."  (*Id.*)  Grigsby

---

[22] Although Plaintiff's brief states that "Dr. Szabo did not ask Plaintiff whether she had been to Brookwood Urgent Care . . .," her testimony does not fully support this statement. (Grigsby Dep. at 199, 261-62.)  Instead, Grigsby merely states that Dr. Szabo asked her whether she had been to "Brookwood."  (*Id.*)

[23] Dr. Szabo testified that she asked her to sign the forms so she could obtain medical information regarding Grigsby's visit to both Brookwood and AFC on August 9, 2008.  (Szabo De. at 167.)

submitted this form on or around August 14, 2008 to the USS medical building. (Grigsby Dep. at 279.)

### I. Grigsby's Discipline and EEOC Charges

On August 13, 2008, USS suspended Grigsby for five days subject to discharge for the following three infractions: "(1) You were absent without just cause (2) You provided false statements to the plant physician (3) you provided false statements during an investigation." (Pl. Exh. 21.)  The discipline for being absent without just cause was based upon Grigsby keeping herself out of work under Medical Class III by refusing to release her medical records to verify her claim.  (Def.'s Exhs. 36-37, 9(b) Hearing Minutes and Second Step Minutes.)  The discipline for providing false statements to the plant physician was based on Grigsby's denial to Dr. Szabo that she sought treatment at Brookwood or Brookwood Urgent Care.  (*Id.*)  The discipline for providing false statement during an investigation was based upon Grigsby maintaining that she did not seek treatment for her work-related injury.  (*Id.*) Area Manager Henson, Division Manager Kelly and Labor Coordinator Coombes made the decision to issue the discipline, based on the information provided by Kelly and Dr. Szabo.  (Kelly Dep. at 120-22; Coombes Dep. at 89-90.)

The same day Grigsby received this discipline, she filed a charge of discrimination with the EEOC.  (Pl. Exh. 22.)  The charge alleged discrimination on

36

the basis of sex regarding her suspension. (*Id.*)  More specifically, Grigby alleged the

following, in pertinent part:

> On August 11, 2008, I was subjected to adverse terms and
> conditions of employment when I was threaten with
> discharge if I did not report to work after calling off due to
> a personal illness.  Upon returning to work, for fear of
> losing my job, I was subjected to harassment and
> intimidation by the shift manager and a member of the
> security department.  I was belittled and had fingers
> pointed in my face.  I was questioned as to whether I had
> relatives that worked for the employer.  On August 13,
> 2008 I was suspended for five days without pay.  Males
> have not been forced to come into work after reporting off
> due to personal illness.  It is my belied that males have not
> had fabricated allegations made against them by the plant
> physician, subjected to an investigation without their
> knowledge or having their doctor's excuse scrutinized in
> the manner in which my doctor's excuse was.

(*Id.*)  USS admits that received the charge of discrimination on August 18, 2008.

(Def.'s Br. at 49.)

On August 19, 2008, USS, Grigsby and the USW conducted a hearing under

the procedures in the BLA to address Grigsby's discipline.  (Grigsby Dep. at 277.)

This is commonly referred to as the 9(b) hearing or first step hearing and is a fact-

finding hearing with the union and USS representatives.  During the hearing, Grigsby

continued to deny that she sought treatment for the cut on her neck on August 9, 2008

and again denied going to Brookwood.  (Def.'s Exh. 36.)  Also during the hearing,

Grigsby mentioned for the first time that her symptoms were related to her wisdom tooth being pulled[24] on the same side as the cut on her neck.  (*Id.*)

At some point after the hearing, but before August 21, 2008, Coombes attempted to resolve Grigsby's grievance by negotiating a settlement agreement with Grigsby and the USW.  (Grigsby Dep. at 288-89; Coombes Dep. at 108.)  Under the terms of the agreement, Grigsby would not receive any discipline if she would authorize the release of her medical records to the USS Medical Department and those medical records verified her story.  (Grigsby Dep. at 290-92; Coombes Dep. at 109-10.)  Grigsby refused to sign the agreement.  (*Id.*)  She testified that she did not sign the agreement because she did not know what information her medical records might contain since they were completed by others.  (Grigsby Dep. at 294.)

On August 21, 2008, USS converted Grigsby's suspension to a discharge. (Def.'s Exh. 38.)  The same day, Grigsby spoke with Joe Thomas of the USW and filed an official civil rights complaint against USS.  (Grigsby Dep. at 297-98.) Grigsby also filed her second charge of discrimination with the EEOC on August 21,

---

[24] On August 6, 2008, Grigsby had a wisdom tooth extracted from her lower left jaw. (Pl.'s Exh. 12.)  The doctor prescribed an antibiotic.  (*Id.*)  Grigsby did not miss any work for this extraction and there is no evidence in the record that USS had any knowledge of this surgery until the August 19, 2008 hearing.  The only evidence relating to any knowledge on the part of USS is a note by Coleman Kelly from August 9, 2008 stating that "Dr. Szabo called to inform me that Ms. Grigsby had been examined at Princeton and reported a possible tooth problem.  This would be unrelated to work injury."  (Kelly Dep. at 76-78.)

2008.  (Pl. Exh. 23.)  In this charge, Grigsby alleged discrimination because of sex and disability, as well as retaliation.  (*Id.*)  More specifically, Grigsby alleged the following, in pertinent part:

> On August 13, 2008, I filed a charge of discrimination against the above employer.  On August 21, 2008, the employer drew up a settlement agreement based a union grievance I had filed against the employer.  I was told that if I didn't drop my charge of discrimination my suspension would be converted to a discharge.  I refused to sign the agreement so I was terminated.  Also, I was threatened with the release of my medical information for a non-work related problem.  Males and employees who have not filed charges of discrimination are not subjected to this treatment.

(*Id.*)  Grigsby supplemented her charges on August 22, 2008 and alleged denial of training and advancement based on gender.  (Def.'s Exh. 42.)

Grigsby was denied Justice and Dignity, which allows employees in certain situations to continue working pending arbitration, because Dr. Szabo classified her as Med Cert III.  (Coombes Dep. at 152-53.)  On August 22, 2008, Grigsby and the USW filed grievances challenging the discipline.  (Grigsby Dep. at 295; Def.'s Exh. 39.)

On August 28, 2008, a Second Step hearing was held, in accordance with the BLA.[25]  (Def.'s Exh. 37; Pl.'s Exh. 24.)  At the hearing, Grigsby stated that she did not recall saying that she went to get another unbiased opinion for her neck injury on August 9, 2008.  (*Id.*; Grigsby Dep. at 298.)  USS continued to deny the grievance through the Second and Third Steps on the grievance procedure.  (Def.'s Exh. 40.) Ultimately, Grigsby appealed the denial of her grievance to arbitration on October 8, 2008.  (*Id.*)  The arbitration was held on October 29, 2009, and on December 18, 2009, the arbitrator reversed Grigsby's termination and ordered her to be reinstated, finding that USS had not established proper cause for her discharge.  (*Id.*)

## IV.  Analysis

After the voluntary dismissal of Counts III and IV of Plaintiff's complaint, two claims remain.  Grigsby's first claim is that she was discriminated against because of her gender in violation of Title VII.   Specifically, she contends that USS discriminated against her by (1) requiring her to perform less desirable work than male employees; (2) denying her training during her probationary period; and (3) discharging her.  Her second claim is that she was discharged in retaliation for her

---

[25] Grigsby testified that she attempted to have Joe Thomas, Chairman of the Civil Rights Committee, attend the Second Step Hearing wit her, but that Coombes instructed him to leave. (Grigsby Dep. at 286-87; Def.'s Exh. 37; Pl.'s Exh. 24.)  Grigsby stated that she believed her civil rights had been violated and she wanted Thomas to attend.  (*Id.*)  Coombes told her that any civil rights concerns were to be handled in accordance with the procedures in the BLA.  (*Id.*)

prior complaints of discrimination and because she filed an EEOC Charge of Discrimination in violation of Title VII. The analysis of Plaintiff's claims will be determined not only by the nature of the allegations but also by the quality of the evidence offered in support of those claims. *See Standard v. A.B.E.L. Servs. Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998) ("[t]he analytical framework and burden of production var[y] depending on the method of proof chosen").

## A. Grigsby's Claims of Discrimination

Title VII prohibits employers from discriminating against employees because of their gender. *See* 42 U.S.C. § 2000e-2(a)(1)-(2). To succeed on a Title VII gender claim, a plaintiff bears the burden of producing a prima facie case of discrimination. *Holifield v. Reno*, 115 F.3d 1555, 1561 (11th Cir. 1997). A plaintiff may discharge his burden by offering "direct evidence, circumstantial evidence or statistical evidence." *Standard,* 161 F.3d at 1330. Here, Grigsby offers no statistical evidence of discrimination. She does, however, attempt to prove her claims of discrimination using the other two theories, direct and circumstantial evidence.

Under the theory of direct evidence, Grigsby argues that she presented direct evidence of discrimination in her termination. (Pl. Br. at 86-88.) In the alternative, she proceeds under a theory of circumstantial evidence regarding her termination. (*Id.* at 88-91.) As for her claims of discrimination in work assignments and training,

she proceeds only under a theory of circumstantial evidence.[26]  (*Id.* at 39-61.)  All are

discussed in detail below.

### 1. Direct Evidence of Discrimination

Direct evidence of discrimination is "evidence which, if believed, proves the

existence of a fact in issue without inference or presumption."  *Bass v. Bd. of County*

*Comm'rs*, 256 F.3d 1095,1105 (11th Cir. 2001), *abrogation on other grounds*

*recognized by Crawford v. Carroll*, 529 F.3d 961 (11th Cir. 2008) (quotations and

citations omitted); *see also Wilson v. B/E/ Aerospace, Inc.*, 376 F.3d 1079, 1086 (11th

Cir. 2004).  Such direct evidence reflects "a discriminatory . . . attitude correlating to

the discrimination . . . complained of by the employee" and must indicate that the

adverse employment decision was motivated by the decisionmaker's intent to

discriminate.  *Damon v. Fleming Supermarkets of Fla, Inc.*, 196 F.3d 1354, 1358-59

(11th Cir. 1999).  If a plaintiff can demonstrate that her termination was prompted by

her sex, then "the ultimate issue of discrimination is proved."  *Bell v. Birmingham*

*Linen Serv.*, 715 F.2d 1552, 1556 (11th Cir. 1993).  In such a situation, summary

---

[26] Plaintiff effectively concedes this point as her Response in Opposition to Defendant's Motion for Summary Judgment (doc. # 20) with regard to her claims of disparate treatment in the assignment of less desirable work and the denial of training as she analyzes these claims only from the standpoint of the *McDonnell Douglas* burden-shifting analysis used for circumstantial cases. (*See* Pl. Br. at 38-61.)  She does not make any allegations that any of the alleged discriminatory statements are direct evidence of discrimination.  (*Id.*)

judgment is inappropriate and the burden of persuasion at trial shifts to the employer to prove by a preponderance of the evidence that it would have made the same decision even without the discriminatory motive. *See Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 641 (11th Cir. 1998).

"It is a rare case, however, where there exists actual direct evidence of discrimination." *Copley v. Bax Global, Inc.*, 80 F.Supp. 2d 1342, 1348 (S.D. Fla. 2000). The reason that true direct evidence is the exception rather than the rule is that "[o]nly the most blatant remarks, whose intent could be nothing other than to discriminate" as constituting direct evidence of discrimination. *Clark v. Coats & Clark, Inc.*, 990 F.2d 1217, 1223 (11th Cir. 1993). For instance, a statement by an assistant store manager to a plaintiff that "we won't be hiring you . . . because of conditions of your pregnancy" and that "[y]ou're welcome back after you've had the baby," is direct evidence of pregnancy discrimination. *See EEOC v. Wal-Mart Stores, Inc.,* 156 F.3d 989, 990-92 (9th Cir. 1998). On the other hand, a comment by a partner of a law firm to a plaintiff that "if you were my wife, I would not want you working after having children," does not constitute direct evidence of pregnancy discrimination concerning the firm's decision to terminate the plaintiff after her pregnancy. *See Kennedy v. Schoenberg, Fisher & Newman, Ltd.*, 140 F.3d 716, 724 (7th Cir. 1998). Thus, as these examples indicate, there must be a direct correlation

between the adverse employment action and the discriminatory comment for such a statement to constitute direct evidence.[27]

Here, the alleged actions and statements by Kelly and Henson do not demonstrate race discrimination without inference.   Grigsby highlights three comments "in particular" as direct evidence of discrimination:

- Division Manager Coleman Kelly asked Union Representative Jackson why he wanted to help Grigsby because she was "sucking and fucking everybody's dicks out here."  (Jackson Decl. ¶ 9.)
- Kelly's comment that "we should have fired her ass when she was on probation."  (*Id.* ¶ 11.)
- Area Manager Kevin Henson's general statement that "women are more trouble than they're worth out here."  (Grigsby Dep. at 127-28.)

(Pl. Br. at 88-89.)   These statements clearly do not amount to direct evidence of discrimination.   The second statement has nothing to do with sex whatsoever, and the other two, while inappropriate and offensive, do not evince on their face an intent to

---

[27] Grigsby quotes Judge Tjoflat's opinion in *Wright v. Southland Corp.*, 187 F.3d 1287 (11th Cir. 1999) for the proposition that the Eleventh Circuit has adopted a more relaxed definition of direct evidence.  According to Grigbsy, the definition applied in this Circuit is not the traditional definition set forth below, but is rather "any evidence of [sic] that can convince a jury that, 'more likely than not,' Plaintiff's termination was due to her gender constitutes direct evidence of discrimination."  (Pl. Br. at 87).  The court disagrees.  Judge Tjoflat's definition of direct evidence is mere obiter dictum, as it was not necessary to the resolution of the case, and neither of the two other members of the panel, Judges Cox and Hull, joined in that portion of the opinion.  Such was specifically recognized by the Eleventh Circuit in *Kilpatrick v. Tyson Foods, Inc.*, 268 Fed. Appx. 860 (11th Cir. March 10, 2008).  Indeed, the Eleventh Circuit has not since applied Judge Tjoflat's definition of direct evidence.  *See, e.g., Morris v. Emory Clinic, Inc.,* 402 F.3d 1076, 1081 (11th Cir. 2005); *Wilson v. B/E Aerospace*, 376 F.3d 1079, 1086 (11th Cir. 2004); *Damon v. Flemin Supermarkets of Fla, Inc.*, 196 F.3d 1354, 1358-59 (11th Cir. 1999); *Beaver v. Rayonier, Inc.*, 200 F.3d 723, 729-30 (11th Cir. 1999).

discriminate against Grigsby in her termination on the basis of her sex.  They require the court to infer too much and, as previously explained, direct evidence does not require such an inferential leap.  *See Burrell v. Bd. of Trs. of Ga. Military Coll.*, 125 F.3d 1390, 1393-34 (11th Cir. 1997) (a statement that merely suggests, but does not prove, a discriminatory motive is circumstantial evidence by definition).  Simply put, they do not directly show that Grigsby was terminated because of her gender.  The alleged statements do not "indicate that the complained-of employment decision was motivated by the decisionmaker's [sexism]." *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1358-59 (11th Cir. 1999).  As such, they do not amount to direct evidence of discrimination, and  Grigsby must proceed under a theory of circumstantial evidence for her claim of discriminatory termination.

## 2.  Circumstantial Evidence of Discrimination

"In evaluating [discrimination] claims supported by circumstantial evidence, [the courts of this circuit] use the now-familiar framework established by the United States Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), and *Texas Department of Cmty. Affairs v. Burdine*, 450 U.S. 248, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981)." *Combs,* 106 F.3d at 1527. Under the *McDonnell Douglas* and *Burdine* framework, the plaintiff first has the burden of establishing a prima facie case of discrimination, which creates a

45

rebuttable presumption that the employer acted illegally.  *See id.* at 1527-28.  The methods of presenting a prima facie case, as well as the exact elements of the case, are not fixed; rather they are flexible and depend to a large degree upon the facts of the particular situation.  *See, e.g., Nix v. WLCY Radio/Rahall Commc'ns*, 738 F.2d 1181, 1185 (11th Cir. 1984); *Lincoln v. Bd. of Regents of Univ. Sys.*, 697 F.2d 928, 937 (11th Cir. 1983).  In general, a plaintiff establishes a prima facie case of disparate treatment employment discrimination by showing that he or she was a qualified member of a protected class and was subjected to an adverse employment action but that otherwise similarly situated employees outside the plaintiff's class were treated dissimilarly.[28]  *See McDonnell Douglas*, 411 U.S. at 802 (hiring); *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997) (discipline); *see also Nix*, 738 F.2d at 1185 (discipline); *Pittman v. Hattiesburg Mun. Separate Sch. Dist.*, 644 F.2d 1071, 1074 (5th Cir. 1981) (wages).

Once the plaintiff has shown a prima facie case and, thereby, has raised the presumption of discrimination, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions.[29]  *See Rojas*, 285 F.3d

---

[28] *See also McDonnell Douglas*, 411 U.S. at 802 n.13 ("The facts necessary will vary in Title VII cases, and the specification above of the prima facie proof required from respondent is not applicable in every respect in different factual situations.").

[29] *See Chapman*, 229 F.3d at 1032 (A subjective reason is a legally sufficient, legitimate, nondiscriminatory reason if the defendant articulates a clear and reasonably specific factual basis

at 1342; *Combs*, 106 F.3d at 1528. The employer "need not persuade the court that it was actually motivated by the proffered reasons." *Burdine*, 450 U.S. at 254-55; <u>see</u> *Chapman*, 229 F.3d at 1024. If the employer satisfies that burden by articulating one or more such reasons, then the presumption of discrimination falls and the burden of production again shifts to the plaintiff to offer evidence sufficient for a reasonable jury to conclude that the employer's supposedly legitimate reason is merely a pretext for illegal discrimination.[30] Where the defendant articulates multiple, reasonable, legitimate and nondiscriminatory reasons, plaintiff must rebut each of defendant's proffered reasons. *See Chapman*, 229 F.3d at 1024-25. Although the prima facie case is irrelevant once the employer has offered a legitimate reason for its actions, the evidence of pretext may include the same evidence offered to establish the prima facie case. *See Combs*, 106 F.3d at 1528.

Despite this shifting of the burden of production between the plaintiff and the defendant under the *McDonnell Douglas* and *Burdine* framework, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Burdine*, 450 U.S. at 253.

---

upon which the employer based its subjective opinion.).

[30] If the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot recast the reason but must meet it head on and rebut it. Simply quarreling with that reason is not sufficient. *Chapman*, 229 F.3d at 1030.

47

Given that the ultimate burden of persuasion always lies with the employee, a plaintiff may prevail on an employment discrimination claim and may also defeat a summary judgement either by proving that intentional discrimination did indeed motivate the defendant or by producing sufficient evidence to allow a rational trier of fact to disbelieve the employer's proffered legitimate reasons, thus permitting but not compelling the trier of fact to make a finding of illegal discrimination. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147-48 (2000) (pointing out that the production of the necessary sufficient evidence by plaintiff will not always prevent the employer from prevailing on a Rule 50 motion and suggesting that the strength of plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other properly considered evidence that supports the employer's case are among other factors to take into account in evaluating a Rule 50 motion); *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993); *Abel v. Dubberly*, 210 F.3d 1334, 1339 (11th Cir. 2000); *Alexander v. Fulton County*, 207 F.3d 1303, 1336 (11th Cir. 2000); *Combs*, 106 F.3d at 1529-38 (interpreting *Hicks* and the post-*Hicks* case law); *Hairston v. Gainesville Sun Publ'g Co.*, 9 F.3d 913, 920-21 (11th Cir. 1993).

It is under the above-discussed framework that the court evaluated Grigsby's claims of discrimination because of gender. Grigsby contends that USS discriminated

48

against her by (1) requiring her to perform less desirable work than male employees; (2) denying her training during her probationary period; and (3) discharging her. USS argues that Grigsby fails to establish a prima facie case of discrimination regarding all three of these allegations, and even if she could, she failed to offer evidence sufficient for a reasonable jury to conclude that USS's legitimate reasons for its actions were merely a pretext for illegal discrimination.

### a. The Prima Facie Case

In general, a plaintiff establishes a prima facie case of disparate treatment employment discrimination by showing that she is a qualified member of a protected class, was subjected to an adverse employment action, and other similarly situated employees outside the plaintiff's class were treated more favorably.[31]  *See Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1087 (11th Cir. 2004); *see also Maynard v. Bd. of Regents of Div. of Univs. of Fla. Dept. of Educ.*, 342 F.3d 1281, 1289 (11th Cir. 2003) and *Holifield*, 115 F.3d at 1562 (11th Cir. 1997).  Here, there is no dispute that Grigsby, a female, is a member of a protected class.  Likewise, there is no dispute that Grigsby is qualified to perform the job of Utility Person.  Grigsby now bears the burden of producing evidence sufficient for a reasonable jury to conclude that she has

---

[31] *See also McDonnell Douglas*, 411 U.S. at 802 n.13 (observing that "[t]he facts necessary will vary in Title VII cases, and the specification above of the prima facie proof required from respondent is not applicable in every respect in different factual situations.").

suffered an adverse employment action and that a similarly situated male employee was treated more favorably.  *Holifield*, 115 F.3d at 1562.

## 1.  The Allegedly Adverse Employment Actions

Not all conduct by an employer negatively affecting an employee constitutes an adverse employment action. *Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1238 (11th Cir. 2001).  The non-discrimination provisions of Title VII require a plaintiff to show a change in the "compensation, terms, conditions, or privileges of [her] employment" in order to prevail. 42 U.S.C. § 2000e-2(a)(1). Courts use the phrase "adverse employment action" as a shorthand for that statutory language. *Davis v. Town of Lake Park, Florida*, is the leading case in the Eleventh Circuit defining "adverse employment action" in the context of discrimination cases:[32]

---

[32] Plaintiff assumes that the standard articulated by the Supreme Court in *Burlington Northern & Santa Fe R.R. Co. v. White*, 126 S. Ct. 2405 (2006) for establishing adverse employment actions in retaliation claims applies equally to establish adverse employment actions in disparate treatment claims. Such an assumption is misplaced. Unpublished decisions in the Eleventh Circuit analyzing disparate treatment actions after *Burlington* have failed to apply the *Burlington* adversity standard to disparate treatment claims. *See Wallace v. Georgia Dep't of Transp.*, 212 Fed. Appx. 799, 801 2006 WL 3626967, No. 06-13345 at **2 (11th Cir. Dec.13, 2006) ("Under the standard of review articulated in *Davis*, [plaintiff] cannot establish that his written reprimand constitutes an adverse employment action needed for a prima facie disparate treatment case."); *Njie v. Regions Bank*, 198 Fed. Appx. 878, 882-83, 2006 WL 2711953, No. 05-13061 at **3 (11th Cir. Sept. 22, 2006) (applying the Davis analysis of adversity to plaintiff's disparate treatment claim); *Davis v. U.S. Postmaster Gen.*, 190 Fed. Appx. 874, 876, 2006 WL 2087569, No. 05-14911 at **2 n.2 (11th Cir. July 26, 2006) ("In reaching this conclusion on [plaintiff's] disparate treatment claim, we need not discuss the Supreme Court's recent decision about the nature of an adverse employment act in a different context: the context of a retaliation claim.") And while unpublished decisions are not considered binding precedent, they are persuasive authority and valuable indicators as to what the Circuit would decide in a published

> [T]o prove adverse employment action in a case under Title VII's anti-discrimination clause, an employee must show a serious and material change in the terms, conditions, or privileges of employment. Moreover, the employee's subjective view of the significance and adversity of the employer's action is not controlling; the employment action must be materially adverse as viewed by a reasonable person in the circumstances.

*Id.* at 1239-40 (internal citations, brackets, and quotation marks omitted).

Grigsby contends that three actions by USS amount to adverse employment actions prohibited by Title VII: (1) the assignment of less desirable work; (2) the denial of training; and (3) termination. It is undisputed that Grigsby's termination amounts to an adverse employment action. (*See* Doc. #21 at 43.) USS contends, however, that the other two actions alleged by Grigsby, the assignment of less desirable work and the denial of training, do not rise to the level of adverse employment actions under *Davis*. The court disagrees.

First, as for her work assignments during her early probationary period, Grigsby contends that she was required to perform less desirable work more often than male employees. Specifically, she alleges that she had to clean the basement of the mill during the first two months of her probationary period and also had to clean the manager's office while male employees did not. USS contends, however, that

---

opinion. *See* Eleventh Circuit Rule 36-2.

these assignments were not an adverse employment action because it did not change any terms or conditions of her employment by making her clean since the job description of a Utility Person includes performing general labor. (Def.'s Br. at 38.) Indeed, Grigsby admitted that cleaning the basement fell within her job responsibilities. (Grigsby Dep. at 66.) Additionally, Grigsby was paid the same during the times that she cleaned and when she was banding. ((Def.'s Exh. 4 at 183.)

The problem with USS's argument is that it does not take into account the conditions under which and the frequency with which Grigsby cleaned. Grigsby's testimony is particularly telling in this regard. She testified that she cleaned the basement all day, every day, for the first two months of her probationary period in conditions that were beyond what other employees did while cleaning:

> So, for the first two months of me working at U.S. Steel, I spent every day in the basement wearing a Tyvek Suit, cleaning grease, painting, using mineral spirits, cleaning machines, having the animal fat drip all over me and smelling really disgusting. And in the heat, it is very, very hot in that basement. I spent every single day for two solid months my first two months of employment in that basement. And when I would come up from the basement covered in animal fat smelling and being hot and feeling like I was going to pass out . . . .

(Grigsby Dep. at 45-46.)  Moreover, while she was subjected to this type of demeaning work, she was alone and isolated.

Eleventh Circuit has instructed district courts to apply "the adverse action requirement carefully . . . when the plaintiff's claim is predicated on h[er] disagreement with h[er] employer's reassignment of job tasks" because "[w]ork assignment claims strike at the very heart of an employer's business judgment and expertise because they challenge an employer's ability to allocate its assets in response to shifting and competing market priorities," *Davis*, 245 F.3d at 1244. The Court further stated that "[i]n the vast majority of instances, . . . we think an employee alleging loss of prestige on account of a change in work assignments, without any tangible harm, will be outside the protection afforded by Congress in Title VII's anti-discrimination clause . . . . " *Id.* at 1245. The "unusual" exception must involve a change in duties "so substantial and material" as to alter the terms and conditions of employment. *Id.*

The court concludes that this case is that "unusual" exception. Although there was not a change in duties in this case, the conditions under which Grigsby had to clean the basement were undeniably disgusting, demeaning and degrading. Her testimony clearly illustrates the deplorable working conditions, including shoveling sludge and being covered in animal fat and grease. (*See* Grigsby Dep. at 45-46, 109.) In contrast to the cleaning duties she endured for two months, Grigsby testified that male Utility Persons were required to clean no more than once a week, on a

"downturn" when production stopped, and on these occasions cleaned the basement in groups.  (Grigsby Dep. at 47-48, 66; *see also* Reynolds Decl. ¶ 4, 7.)  In sum, Grigsby has presented evidence that the difference between her work assignments cleaning the basement and the cleaning assignments of the other Utility Persons was "so substantial and material" as to constitute an adverse employment action.[33]  *Id.*; *compare Mariano v. Potter*, 2006 WL 907772, at *13 (S.D. Ala. April 7, 2006).

Second, as to training, Grigsby contends that she was denied training during her probationary period and afterwards that would have allowed her "step-up pay." (Pl. Br. at 46-49.)  Although USS states that this alleged denial "does not equate with an adverse employment action" it does not make any substantive argument in support of this statement.[34]   (Def. Br. at 41-42.)   Indeed, this is understood as Grigsby produced evidence that lack of training directly impacted her ability to earn more

---

[33] USS cites an unpublished district court opinion from the Southern District of Alabama in support of its contention that her work assignments were not an adverse employment action. *Mariano v. Potter*, 2006 WL 907772, at *13 (S.D. Ala. April 7, 2006).  This case, however, actually bolsters Grigsby's claim.  In *Mariano*, the plaintiff alleged that he was assigned less desirable work than the other custodians.  *Id.*  The plaintiff, however, did not identify the other tasks assigned to him nor the tasks assigned the other custodians, "rendering it impossible to determine whether the plaintiff's duties were substantially more onerous, unpleasant or otherwise undesirable."  *Id.*   Grigsby did present such evidence.

[34] Instead, USS focuses on the alleged comparator aspect of the prima facie case.  (Def. Br. at 41-42.)

money doing jobs in a higher pay grade as needed.[35]  (Grigsby Dep. at ).  USS does not dispute this fact.  As such, both the less desirable working assignment and denial of training amounted to adverse employment actions.

## 2.  The Alleged Comparators

Comparators are necessary to the prima facie disparate treatment analysis – there must be sufficient evidence for a jury to conclude that other employees outside of plaintiff's class were treated more favorably.  *Maniccia v. Brown,* 171 F.3d 1364, 1368 (11th Cir. 1999); *see also Jones v. Bessemer Carraway Med. Cntr*., 137 F.3d 1306, 1311 (11th Cir. 1998), *superceded in non-relevant part on denial of reh'g*, 151 F.3d 1321 (11th Cir. 1998).  "The plaintiff and the employee she identifies as a comparator must be similarly situated in all relevant respects."  *Wilson*, 376 F.3d at 1091 (internal quotation and citation omitted).  The comparator must be nearly identical to the plaintiff to prevent courts from second-guessing a  reasonable decision by the employer.  *See* Silvera *v. Orange County Sch. Bd.*, 244 F.3d 1253, 1259 (11th Cir. 2001).

---

[35] Of course, in order to prove damages as to this claim, Grigsby would have to produce specific evidence regarding instances she would have been able to perform these higher-graded jobs if she had been timely trained.

### i. Assignment of Less Desirable Work

USS contends that Grigsby cannot establish this final prong of her prima facie case because she cannot establish that similarly situated males were treated better. (Def.'s Br. at 39.)  In support of this argument, USS contends that Grigbsy "cannot point out a male Utility Person in the Cold Reduction Department with less seniority who was not required to clean" and that she "has not pointed out any less senior male employees who were even available during the first four months of her probationary period to clean." (*Id.*)  This argument misses the mark.

Grigsby has produced evidence sufficient to establish that males did not have to endure the same type of cleaning assignments that she had to endure.  Grigbsy produced evidence, by way of former co-worker Demetrius Reynolds, who testified that "[m]ale employees were not assigned to work in the basement of the Cold Reduction and Pickling Department during production hours, nor were any male employees assigned to work in the basement . . . by themselves for an entire shift." *(* Reynolds Decl. ¶ 4.)  Instead, as Grigsby testified, male Utility Persons were required to clean no more than once a week, on a "downturn" when production stopped, and on these occasions cleaned the basement in groups. (Grigsby Dep. at 47-48, 66; Reynolds Decl. ¶¶ 4,7.)  Further, Reynolds testified that as a Utility

Person[36] he was never required to clean the managers' office. (Reynolds Decl. ¶ 5.) Such evidence is sufficient, at this stage in the litigation, to establish that similarly situated males were treated better than Grigsby with regard to the less desirable cleaning assignments. Therefore, Grigsby has established a prima facie case regarding this claim of discrimination.

## ii. Denial of Training

As evidence of a comparator for the denial of training, Grigsby points to two different types of training she was denied or was not allowed to train on as quickly as other male employees. First, regarding New Employee Orientation, she contends that Chris Barker, William Chambers, Kirk Ratcliff and Earnest Mullins, four male Utility Workers who were hired after she was were allowed to attend a new employee orientation the day after their hire, while she had to wait more than two months for her orientation. (Grigsby Dep. at 42-43; Pl. Exh. 8.) According to Grigsby, she was told that she was not allowed to train on any equipment such as the forklift until she completed new employee orientation.[37] Grigsby Dep. at 42-43.) However, Demetrius

---

[36] Reynolds is now a Operation Technician. (Reynolds Decl. ¶ 2.)

[37] As explained in the facts section, if Grigsby had this training, she would have been eligible to perform higher paying work as it came available.

Reynolds testified that he banded before new employee orientation. (Reynolds Decl. ¶ 3.)

USS contends that "[r]egardless of the truth of this allegation by Plaintiff, it makes no difference" because "Plaintiff was permitted to attend the first new employee orientation session with available positions . . . after her date of hire." (Reply Br. at 8) (citing Watson Decl. ¶ 3.)  Additionally, USS argues that "[w]hat is critical is that Plaintiff cannot show that any male hired after her was allowed to attend a session before she was or that she was not allowed to attend the first available session." (*Id.*)  USS's argument is misplaced.  While the court appreciates this argument, it is more appropriately considered in the court's analysis regarding legitimate, nondiscriminatory reason for not allowing Grigsby to immediately attend orientation, as the four males identified by Grigsby did.  Grigsby sufficiently identified male comparators who were allowed to train before she, thus establishing this prong of the prima facie case.

Second, Grigsby contends that male employees with less seniority were allowed to operate equipment while she was assigned manual labor.  (Pl. Br. at 52-53.)  Regarding the Ram Tractor, Grigsby contends that Ralph Truett, Chris Barker

and William Chambers all trained on the Ram Tractor before she did.[38] (Grigsby Dep. at 97; Jackson Decl. ¶¶ 5-6.) Specifically, Jackson testified that Barker and Chambers trained on the ram tractor within two months of their hire. (Jackson Decl. ¶¶ 5-6.) In fact, Grigbsy presented evidence that Chris Barker, a male employee hired four months after Grigsby, drove the fork truck while she had to walk beside it and pick up trash. (*Id.* ¶ 8.) While USS argues that these men are not suitable comparators, the court disagrees. At this stage in the litigation, Grgisby's evidence is sufficient to establish this final prong of the prima facie case, that USS treated similarly situated male employees more favorably.

### iii. Termination

Although it is undisputed that Grigsby's termination is an adverse employment action, she must still establish that similarly situated males were treated more favorably than she. *See Maniccia,* 171 F.3d at 1368. This she did not do. In fact, Grigsby concedes that she cannot produce such comparator (Pl. Br. at 88-91), but states that her "inability to present a precisely similarly situated comparator who was

---

[38] Although USS contends that "Plaintiff acknowledged that no male employee with less seniority ever received training on the Ram Tractor before her," (Reply Br. at 9), this statement is not entirely accurate. Instead, in response to the question whether a male with less seniority trained on the tractor before she did, Grigsby stated "not to my knowledge. Not to my recollection." (Grigsby Dep. at 97.) She now, however, produced evidence in the form of a declaration from Jackson that at least two male employees trained within two months of their hire. (Jackson Decl. ¶¶ 5-6.)

subjected to the exact same rigamarole she was should not foreclose her legitimate claim of discriminatory termination, especially where when there is such an abundance of Defendant's demonstrated bias against Plaintiff and other women." (*Id.* at 91.)  The court cannot, however, simply ignore Grigby's inability to establish this fourth element of her prima facie case.  The court must follow the law, as established by the Eleventh Circuit, which requires all four elements be met to establish a prima facie case of discrimination.

Therefore, in summary, Grigbsy established a prima facie case of discrimination with regards to the assignment of less desirable work and the denial of training.  Her prima facie case for her claim of discrimination with regard to her termination fails because  there is not sufficient evidence for a jury to conclude that a similarly situated male employee was treated more favorably.  As such, Grigsby's claims of disparate treatment on the basis of sex regarding her termination is meritless.

That being said, however, the court is aware that the failure to prove this final element of the prima facie case is not necessarily fatal to Grigsby's claim: "[i]f a plaintiff fails to show the existence of a similarly situated employee, summary judgment is appropriate where no other evidence of discrimination is present." *Holifield*, 115 F.3d at 1562 (internal citation omitted).  However, as explained below,

Grigsby has failed to show any evidence of discrimination with regard to her termination.

### b. USS's Articulated Legitimate, Nondiscriminatory Reasons for the Allegedly Adverse Employment Actions and Grigsby's Evidence of Pretext

Because Grigsby established a prima facie case of discrimination with regard to the assignment of less desirable work and training (and even if she established a prima facie case as to her termination), the burden now shifts to USS to articulate legitimate, nondiscriminatory reasons for its actions. *See Rojas*, 285 F.3d at 1342; *Combs*, 106 F.3d at 1528. If USS satisfies that burden by articulating one or more such reasons, then the presumption of discrimination falls and the burden of production again shifts to Grigsby to offer evidence sufficient for a reasonable jury to conclude that the USS's supposedly legitimate reason is merely a pretext for illegal discrimination. *Id.*

### 1. Assignment of Less Desirable Work

With regard to her work assignments, USS contends that it acted for legitimate, nondiscriminatory business purposes in giving her the cleaning assignments. (Def.'s Br. at 39-40.) Specifically, USS states that "[c]leaning assignments quite simply fell within Plaintiff's job description and laborers are need to clean all areas of the Plant." (*Id.* at 40) (citing BLA at 185; Lacey Dep. at 33.) This articulation by USS satisfies

61

its burden and the burden now shifts to Grigsby to establish that this reason is a pretext for illegal discrimination.

After a painstaking review of the entire record, the court find that Grigsby's evidence of pretext satisfies her burden of offering evidence sufficient for a reasonable jury to conclude that USS's legitimate reasons for its actions were merely a pretext for illegal discrimination.  Grigsby first contends that USS's legitimate, nondiscriminatory reason is unworthy of credence.  In support of this argument, she points to the fact that no male Utility Persons with her job description were required to clean the basement all day, every day, alone, for two straight months.  Although USS attempts to explain away this fact by arguing that she was the most junior employee and it was part of her job description, it has not shown the court any male employee who was subjected to such consistent cleaning of the basement.  Instead, the evidence before the court establishes that male Utility Persons, even while they were the most junior employees, were only required to clean the basement on a weekly basis, and were not required to clean alone.  Additionally, there is absolutely no evidence in the record that any other employee besides Grigsby and another female employee were ever required to clean the managers' office.

Furthermore, while relegated to the disgusting job of cleaning the basement and cleaning the managers' office, Grigsby has produced evidence that she was submitted

to a barrage of sexually-charged comments and advances from her supervisors and

co-workers.  The list of examples is plentiful:

- Coordinator Self repeatedly asked Grigsby to go out with him.  (Grgisby Dep. at 109-10.)  When she refused, her work in the basement changed from painting to shoveling sludge.  (*Id.*)
- Self stated that "had you [Grigsby] gotten some drinks with me maybe you could have gotten some training."  (Slater Decl. ¶ 9.)
- When asking for new protective clothing in which she cleaned the basement, Self, in front of Shift Manager Lacey, told Grigsby to get the clothing two sizes too small because he liked seeing her like that.  (Grigsby Dep. at 119-20)
- Self "made [her] climb down on my hands and knees and pick up paper from under his desk while he sat in his chair, I had to crawl under his desk. And I remember specifically telling him, because this is a room with three sides windows where all the men are on the outside. I asked him - - I said do you know what that's going to look like, me on my hand and knees crawling under your desk while you're sitting in your chair, and he said you're on probation you do what I tell you to do. . . ." (*Id.* at 75-76.)
- Self put Grigsby "on display" and made her stand " on the desk and clean the windows with all the men on the floor pointing at [her] and laughing at [her]."  (*Id.* at 60.)
- Self told Grigsby that he would take care of her if she would take care of him when she asked about training. (Slater Decl. ¶ 8.)
- Shift Manager David Hovator responded to an inquiry about scheduling Grigsby overtime that "maybe it's not what you've done, maybe it's what you haven't done."  (Grigsby Dep. at 130-32.)  Shift Manager Lacey was present and laughed at this comment.  (*Id.*)
- Employees called Grigsby a "dirty girl" and commented that she "liked it dirty" when she was cleaning the basement.  (*Id.*. at 45-46.)
- Other employees referred to Grgisby and another female employee as "Ralph's ho's" and generally referred to women as "split tails, bitches and cunts."  (Grigsby Dep. at 45-46; Slater Decl. ¶ 10.)

- While in a conference room, Self told Grgisby and another female employee "that's a big table, that's a big enough for both of you guys to lay out on." (Grigsby Dep. at 71, 101, 106; Slater Decl. ¶ 11.)

Comments or remarks that suggest discriminatory animus can be sufficient circumstantial evidence to establish pretext. *See Damon*, 196 F.3d at 1362; *Ross v. Rhodes Furniture, Inc.*, 146 F.3d 1286, 1291 (11th Cir.1998). "[W]hether comments standing alone show pretext depends on whether the substance, context, and timing could permit a finding that the comments are causally related to the adverse employment action at issue." *Bonham v. Regions Mortgage, Inc.*, 129 F. Supp.2d 1315, 1332 (M.D.Ala. 2001). The Eleventh Circuit has instructed that "language not amounting to direct evidence, but showing some . . . [sexual] animus, may be significant evidence of pretext once the plaintiff has set out a prima facie case." *Ross v. Rhodes Furniture, Inc.*, 146 F.3d 1286, 1291 (11th Cir. 1998); *see also Rojas*, 285 F.3d at 1343 (potentially discriminatory "comments can contribute to a circumstantial case for pretext").

While these comments alone may not be sufficient to establish pretext, they certainly serve to bolster her claim that she was discriminated against because of her sex in her work assignments. These comments, coupled with the other evidence before the court that no other male ever had to clean the basement for two months straight, or alone, and that no other male had to clean the managers' office, provide

64

enough evidence from which a reasonable fact finder could find discrimination. Accordingly, the court finds that, based on the totality of the evidence before it, Grgisby has presented sufficient evidence to avoid summary judgment on her discrimination claim as it relates to her job assignments.

## 2. Training

USS argues that it acted for legitimate, nondiscriminatory reasons regarding Grigsby's training. (Def. Br. at 42-43.) As for New Employee Orientation, USS stated that orientation sessions are not held on a regular basis, but instead are scheduled as needed. (Watson Decl. ¶ 3.) Attendance is limited at the orientation program because of seating restraints. (*Id.*) Grigsby was hired on February 25, 2008 and attended the first available[39] orientation on April 7, 2008. (*Id.*) As for other training opportunities, USS contends that it focuses on training in positions where roster-depth is lacking, and offers such training only when the budget allows. (Henson Decl. ¶¶ 6, 7.) Additionally, training was based on seniority and no employees with less seniority were trained on positions before her. ( Def. Br. at 42-43.) Such articulations satisfy USS's light burden of production. *See Rojas*, 285 F.3d at 1342; *Combs*, 106 F.3d at 1528.

---

[39] Although there was one earlier orientation on March 24, 2008, that orientation only included employees in the Pipe and Steel Plant and did not include any employees from the plant where Grigsby worked. (Watson Decl. ¶ 3.)

As evidence of pretext, Grigsby states that USS's reasons are not worthy of credence.  She contends that she presented evidence that several less-senior male employees received advanced training on equipment sooner than she.  (Pl. Br. at 55.) As a concrete example, Grigsby points to Chris Barker and William Chambers, who were hired four months after Grigsby, and received training on the forklift and ram tractor before she did.  (Jackson Decl. ¶¶ 5-9.)  Instead, she was forced to walk beside the forklift and pick up trash while Chris Barker drove.  (*Id.* ¶ 8.)  When Union Representative Jackson asked Kevin Henson why the less-senior males were operating the forklift and Grigsby was picking up trash, he was told that she had not been trained on the forklift yet.  (*Id.*)  When asked why she had not been trained, Henson replied "we just ain't trained them."  (*Id.*)

Although USS contends that Grigsby admitted "that males with less seniority were never trained on positions before her" (Def. Reply Br. at 10), this statement is not entirely accurate.  Instead, in response to the question whether a male with less seniority trained on the tractor before she did, Grigsby stated "not to my knowledge. Not to my recollection."  (Grigsby Dep. at 97.)  She now, however, produced evidence in the form of a declaration from Jackson that at least two male employees trained within two months of their hire, (Jackson Decl. ¶¶ 5-6), while the evidence shows that she was cleaning the basement for the first two months of her employment.

66

This evidence, coupled with the sexually-charged statements discussed above, could lead a reasonable factfinder to conclude that USS discriminated against Grigsby because of her sex in denying her training opportunities. In *Reeves*, the Supreme Court explained that "it is permissible for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation." 530 U.S. at 147. A plaintiff may be able to establish that the employer's asserted justification is false and a pretext for discrimination based on some of the same evidence that established a prima facie case of discrimination. *Id.* A plaintiff need not "always introduce additional, independent evidence of discrimination." *Id.* at 148.

After careful examination of the record, the court concludes that Grigsby's "prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Id.* A genuine issue of material fact exists regarding whether the failure to provide Grigsby with training opportunities was based on her sex. Therefore, summary judgment is inappropriate as to this claim of discrimination.

### 3. Termination

As to her termination, USS makes the following three articulations regarding Grigsby's discipline:

(1) for providing false information during an investigation based upon her voicemail message in which she stated she was at a doctor's office for a stiff neck and inflammation around her cut (Plt. Depo., pp. 226-27)), but yet she later denied that she was seeking treatment for a work-related injury. (Coombes Depo., p. 91; 9(b) Hearing Minutes; Second Step Minutes). Plaintiff also told Lacey that she sought a second unbiased opinion because her neck was infected. (Lacey Depo., pp. 65, 86; 08/09/08 Autry E-mail);

(2) for providing false statements to the Plant physician because Dr. Szabo learned from Dr. Ali that Plaintiff was at Brookwood seeking a second opinion for her neck, and Plaintiff later denied to Dr. Szabo that she sought treatment at Brookwood Hospital or Brookwood Urgent Care. (Coombes Depo., pp. 100-05; 9(b) Hearing Minutes; Second Step Minutes); and

(3) for being absent without just cause because she refused to release her medical record which would have allowed USS to verify her statements, and thereby kept herself out of work under Medical Class III. (9(b) Hearing Minutes; Second Step Minutes).

(Def.'s Br. at 44-45.)  Based upon the above, USS states that it had good reason to believe that Grigsby sought treatment at Brookwood Hospital for a work-related injury, and had a good faith basis to discipline Grigsby when she denied it.

As evidence of pretext, Grigsby makes a thorough argument in support of her claim that "the facts" did not justify her discharge.  (Pl. Br. at 73-86.)  She uses thirteen pages of her brief to explain her view and interpretation of the various facts and events that occurred after her August 8, 2008 injury, in an effort to prove that she did not seek medical treatment for a work-related injury.  (*Id.*)

68

However, the "evidence of pretext" presented by Grigsby does nothing more than quibble with the reasons given by USS for the termination, and such an argument is insufficient to establish pretext. *See Chapman*, 229 F.3d at 1030. Her assertions and argument that she (1) did not provide false statements during an investigation, (2) did not provide false statements to Dr. Szabo that she had not sought treatment at Brookwood Hospital or Brookwood Urgent Care, and (3)was not absent without just cause because she would not release her medical records do not alone establish that she was terminated because of her sex. *See Wilson*, 376 F.3d at 1092 (holding that plaintiff's self-serving assertions that the articulated reason is not true did not establish that she had been discriminated against). "A plaintiff must show not merely that the defendant's employment decisions were mistaken but that they were in fact motivated by sex." *Lee*, 226 F.3d at 1253. The role of the court "is to prevent unlawful . . . [employment] practices, not to act as a super personnel department that second-guesses employers' business judgments." *Id.* at 1254.

Whether the actual facts and events support USS's decision is not an issue for this court to referee. That Grigsby disagrees with the decision made by USS and cites to facts that support her version of the story leading up to her discharge simply does not satisfy her burden to prove that USS did not in good faith believe that it had a legitimate basis for her termination. *See Chapman*, 229 F.3d at 1030; *Elrod v. Sears,*

*Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991); *see also Nix*, 738 F.2d at 1187 (11th Cir.1984) (An "employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason."); *Abel v. Dubberly*, 210 F.3d 1334, 1339 n.5 (11th Cir. 2000); *Combs*, 106 F.3d at 1543; *Alexander*, 207 F.3d at 1339, 1341; *Damon v. Fleming Supermarkets of Florida, Inc.*, 196 F.3d 1354, 1361 (11th Cir. 1999) ("We have repeatedly and emphatically held that a defendant may terminate an employee for a good or bad reason without violating federal law. We are not in the business of adjudging whether employment decisions are prudent or fair.") (internal citation omitted)).  Grigsby has done nothing to question USS's  honest belief in its reasons and justifications for terminating her - and she cannot, as there is simply no evidence in the record that calls its belief into doubt.  Even if Grigsby convinced the court that the allegations against her were untrue, she did not present evidence that USS's asserted belief in those allegations was unworthy of credence.  Moreover, her arguments do nothing to bolster her ultimate burden of showing that she has been discriminated against because of her gender.  If anything, Grigsby's "evidence of pretext" merely establishes the depth of the misunderstanding between USS and Grigsby.  It does not, however, shed any light on her claim that she was discriminated against because she was a female.

In summary, two of Grigsby's three claims of discrimination survive summary judgment.  She offered evidence sufficient for a reasonable jury to conclude that USS's legitimate reasons are merely a pretext for illegal discrimination as to both her claim regarding the assignment of less desirable work and the denial of training. Grigsby did not, however, present sufficient evidence regarding her claim of illegal gender discrimination in her termination. As such, summary judgment in favor of USS is appropriate as to this claim.

### B.  Grigsby's Retaliation Claim

Title VII prohibits an employer from discriminating against any individual for participation in or opposition to practices made unlawful by Title VII.  *See* 42 U.S.C. § 2000e-3(a).  To establish a prima facie case of retaliation, Grigsby  must show: (1) that she engaged in protected activity or expression; (2) that she suffered an adverse employment action; and (3) that the adverse employment action was causally connected to the protected conduct.  *See Harper v. Blockbuster Entm't Corp.*, 139 F.3d 1385, 1388 (11th Cir. 1998); *see also Tipton v. Canadian Imperial Bank of Commerce*, 872 F.2d 1491, 1494 (11th Cir. 1989).  If Grigsby is able to advance a prima facie case of retaliation, the burden then shifts in accordance with *McDonnell*

*Douglas* to USS to articulate legitimate, non-discriminatory reasons for the alleged retaliatory acts. *See Phillips v. Aaron Rents, Inc*., 262 Fed. Appx. 202, 2008 WL 111038, No. 07-11477 at *8 (11th Cir. Jan. 11, 2008) ("Retaliation claims are also analyzed under the McDonnell Douglas burden-shifting framework.") (citing *Holifield*, 115 F.3d at 1566). Once her employer articulates such a reason, Grigsby must demonstrate that USS's proffered explanation is a pretext for retaliation for her claim to survive summary judgment. *See id.*

USS does not dispute that her termination was an adverse employment action. Instead, it contends that Grigsby failed to establish a prima facie case because her statutorily protected activity is not causally connected to her termination. As explained above, to state a retaliation claim under Title VII, a plaintiff must allege a defendant retaliated against her because she engaged in statutorily protected activity. *Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261, 1277 (11th Cir. 2008). As with other statutory retaliation claims, such a claim under Title VII requires that the protected activity involve the assertion of rights encompassed by the statute. *See Hawkins v. 1115 Legal Svc. Care*, 163 F.3d 684, 693 (2d Cir. 1998); *see also Gregory v. Ga. Dep't of Human Res.*, 355 F.3d 1277, 1279 (11th Cir. 2004) (stating to establish a retaliation claim under Title VII, the retaliation must be in response to a "statutorily protected activity"); *Wascura v. City of S. Miami*, 257 F.3d 1238, 1247

(11th Cir. 2001) (holding to establish a retaliation claim under the FMLA, the employee must first engage in an activity protected by the FMLA).

USS concedes that Grigsby engaged in two separate forms of protected activity. First, she engaged in protected activity in April 2008 when she complained to Henson. Second, her EEOC charge constitutes protected activity. The court agrees with USS, however, that all her other complaints were "nothing more than generalized complaints concerning her job assignments and lack of training" (Reply Br. at 11) (citing Grigsby Dep. at 61, 64, 75) and do not constitute protected activity. *See Gregory*, 355 F.3d at 1279. Additionally, any complaints made to Jackson, a union representative, were not complaints made to USS, so they cannot be protected activity for purposes of her claim against USS. The question now becomes whether there is any causal connection between her protected activity and her termination.

To establish a causal connection, a plaintiff must show that the decision-maker was aware of the protected conduct and that the protected activity and the adverse action were not wholly unrelated. *See Farley*, 197 F.3d at 1337. The causal link element is generally construed broadly so that "a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated." *Olmstead v. Taco Bell Corp.*, 141 F.3d 1457, 1460 (11th Cir. 1998). Thus, a "close temporal proximity" between the plaintiff's protected conduct and an adverse

employment action generally is sufficient circumstantial evidence of a causal connection for purposes of a prima facie case. *See id.; see also Wascura v. City of South Miami*, 257 F.3d 1238, 1248 (11th Cir. 2001); *see also Maniccia v. Brown*, 171 F.3d 1364, 1370 (11th Cir. 1999). Moreover, the Supreme Court has warned that "mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action . . . must be 'very close.'" *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (citations omitted).

Grigsby failed to establish that her first protected activity, her complaints to Henson in April 2008, are causally related to her termination. The two are not closely related in time. There was a four-month gap between the her complaints and her termination. The Eleventh Circuit has stated that a "three to four month disparity between the statutorily protected expression and the adverse employment action is not enough." *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007); *Drago v. Jenne*, 453 F.3d 1301, 1308 (11th Cir. 2006). Additionally, shortly after her complaints to Henson, Grigsby passed the probationary phase of her employment. (Grgisby Dep. at 110; Watson Decl. ¶ 7.)

Grigsby's EEOC complaint, however, is a closer issue. USS concedes that it became aware of her EEOC charge on August 18, 2008, a mere three days before Grigsby's termination. At first glance, this evidence seems to easily satisfy the "close

74

temporal proximity" required to establish a causal connection.   However, the Eleventh Circuit has stated that temporal proximity is not always adequate to establish a causal connection, and it is not adequate in this case.

Discussing the "causal connection" requirement in the context of a Title VII sexual harassment claim, the Eleventh Circuit observed that, "[w]hen an employer contemplates a given action before the harassment takes place, temporal proximity between the action and the incident of harassment alone will not suffice to show causation." *Cotton v. Cracker Barrel Old Country Store, Inc.*, 434 F.3d 1227, 1232 (11th Cir. 2006) (citing *Clark County Sch. Dist.*, 532 U.S. at 272 (stating in a Title VII retaliation case that a causal link between the employee's transfer and her lawsuit could not be established based upon temporal proximity when it was conceded that the employer "was contemplating the transfer before it learned of the suit")). Similarly, in *Kasper v. Federated Mutual Insurance Co.*, 425 F.3d 496 (8th Cir. 2005), the Eighth Circuit held that there was insufficient summary judgment evidence to establish the causal link requirement on a Title VII retaliation claim and relied upon unrefuted evidence that two weeks prior to the plaintiff's complaint alleging sexual harassment by a first-tier supervisor, the plaintiff's second-tier supervisor had raised specified issues concerning the plaintiff's job performance. *Id.* at 504.  The Eighth Circuit observed that "[e]vidence of an employer's concerns about an

employee's performance before the employee's protected activity undercuts a finding of causation." *Id.* (citation omitted).   The Eighth Circuit reiterated the holding in *Kasper* in *Carrington v. City of Des Moines, Iowa*, 481 F.3d 1046 (8th Cir. 2007), and added that

> post-hoc complaints did not without more raise a retaliation bar to the proposed discipline because "the anti-discrimination statutes do not insulate an employee from discipline for violating the employer's rules or disrupting the workplace." Indeed, complaining of discrimination in response to a charge of workplace misconduct is an abuse of the anti-retaliation remedy.

*Id.* at 1051 (quoting *Griffith v. City of Des Moines*, 387 F.3d 733, 738 (8th Cir. 2004)).

The court is persuaded by the sound reasoning of the Eighth Circuit.  While it true that USS received Grigsby's EEOC charge alleging sex discrimination three days before her termination, USS had already suspended Grigsby on August 13, 2008, five days before it received her EEOC charge.  And, more importantly, that discipline was a suspension for five days subject to discharge.  The record, therefore, establishes that USS had already contemplated terminating Grigsby before its receipt of her EEOC charge.  This prior consideration breaks any sort of temporal connection between the protected activity and Grigsby's termination.

76

Accordingly, the court finds that the fact that USS went ahead with its already-contemplated decision to terminate Grigsby three days after it received her EEOC charge of discrimination does not by itself create a genuine issue of material fact on the issue whether there was a causal connection between her EEOC charge and her termination. "To find otherwise would frustrate an employer's ability to discipline an employee who had filed a complaint alleging discrimination." *Byrne v. Alabama Alcoholic Beverage Control Bd.*, 635 F. Supp. 2d 1281, 1300 (M.D. Ala. 2009). As such, Grigsby has failed to raise a genuine issue of material fact on the issue of causation, and her prima facie case, therefore, fails.[40]

## VI. Conclusion

In summary, the court finds that no material issues of fact remain and that Defendant United States Steel Corporation is entitled to judgment as a matter of law as to the following claims asserted by Plaintiff: (1) discrimination with regard to gender in her termination; and (2) retaliation in her termination.[41] USS is not entitled

---

[40] Even if Grigsby had established a prima facie case on her claim of retaliation in her termination, USS offered legitimate, non-retaliatory reasons for her termination. Grigsby's arguments as to pretext are unavailing for the same reasons discussed regarding her evidence of pretext regarding her claim of discrimination in her termination. Grigsby simply did not present evidence that USS's asserted belief in its allegations against her were unworthy of credence, and her arguments do nothing to bolster her ultimate burden of showing that she was retaliated against for her protected activity.

[41] Summary judgment is also proper regarding her claims under the ADA. *See supra* at 2.

77

to summary judgment on Grigsby's claim of discrimination because of gender regarding the assignment of less desirable work duties and regarding the failure to provide her with training opportunities.  Those two claims are all that remain in this case.  A separate order will be entered granting in part and denying in part the motion for summary judgment.

**DONE** this the ___8th___ day of November, 2010.

_____
SENIOR UNITED STATES DISTRICT JUDGE

78